UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

GREGORY A. STEVENSON, as a
shareholder of CREDIT SUISSE GROUP AG
on behalf of CREDIT SUISSE GROUP AG
shareholders,

               Plaintiff,

vs.

RICHARD E. THORNBURGH, et al.,

               Defendants.

------------------------------------------------------------x

NICOLE LAWTONE-BOWLES, as a
shareholder of CREDIT SUISSE GROUP AG
on behalf of CREDIT SUISSE GROUP AG
shareholders,
               Plaintiff,

vs.

RICHARD E. THORNBURGH, et al.,

               Defendants.

------------------------------------------------------------x

23 Civ. 4458 (CM)

23 Civ. 4813 (CM)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 2/14/24

## DECISION AND ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

McMahon, J.:

     Two plaintiffs, Gregory A. Stevenson and Nicole Lawtone-Bowles ("Plaintiffs") have

brought two cases on behalf of the same Class of Credit Suisse Group AG ("Credit Suisse" or

"Credit Suisse Group AG") shareholders. They assert Swiss law claims that have a significant overlap with the Swiss law claim that was previously brought by a different plaintiff in a state court derivative action – a claim that was quite properly dismissed on the basis of *forum non conveniens*. In a patent and blatant effort to circumvent that ruling, Plaintiffs – different individuals than who had sued in state court, but members of the same class who are represented by the same lawyers – have brought these actions, alleging strikingly similar violations of Swiss law against largely the same defendants.

Needing a hook to get into federal court, knowing that there were already multiple Credit Suisse securities fraud cases pending, and not wishing to compete for Lead Plaintiff status under the Private Securities Litigation Reform Act ("PSLRA"), Plaintiffs have asserted claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO") in addition to their Swiss law claims. They allege a twenty-year scheme of mismanagement carried out through a variety of criminal acts, only some of which qualify as predicate acts under the RICO statute and none of which is pleaded with particularity, despite the prolix 272-page Amended Class Action Complaint (the "Complaint") they filed.

Plaintiffs' causes of action are brought against three groups of defendants (together, the "Defendants"): four of Credit Suisse's New-York based subsidiaries (the "Credit Suisse U.S. Entity Defendants"); 29 present and former Credit Suisse Officers and Directors (the "Credit Suisse Individual Defendants" and collectively with the Credit Suisse U.S. Entity Defendants, the "Credit Suisse Defendants"); and Credit Suisse's purported auditor, KPMG LLP, as well as 11 KPMG LLP partners, employees, and related individuals (the "KPMG Individual Defendants" and together with KPMG LLP, the "KPMG Defendants").

Various groupings of the Defendants have moved to dismiss the Complaint as against them.

For the reasons discussed below, the Complaint is dismissed with prejudice as against all defendants.

## BACKGROUND

### I. The Parties

#### a. Plaintiffs

Plaintiffs Gregory A. Stevenson,[1] a U.S. citizen domiciled in Indiana, and Nicole Lawtone-Bowles, a U.S. citizen domiciled in New York, owned and held Credit Suisse American Depositary Shares ("ADSs") and/or ordinary shares (together, "common stock") between October 22, 2013 and March 17, 2023 (the "Class Period"). Compl. ¶¶ 1, 79, Dkt. No. 60; RCS, at 17, Dkt. No. 36; Opp. Memo., at 6, Dkt. No. 101. Plaintiffs have brought this action on behalf of all Credit Suisse shareholders who held (i.e., owned) Credit Suisse common stock during the Class Period (the "Class"). Compl. ¶¶ 2, 7, 202.

Plaintiffs claim that the Class members' property was damaged by Defendants' RICO violations and Defendants' failure to fulfill their duties of due care, diligence, prudence, and loyalty under the Swiss Code of Obligations. *Id.* ¶¶ 2–4, 8–10, 79, 200, 202, 207, 432; RCS, at 17. The only property damage identified is the precipitous decline in the value of the Credit Suisse shares owned by the Class members – from $33.84 per share to $2.01 per share during the Class Period. Compl. ¶¶ 3, 200, 481. In other words, the Plaintiffs are suing because the value of their securities declined.

#### b. Defendants

##### i. The Credit Suisse U.S. Entity Defendants

---

[1]   The *Stevenson* Complaint is the operative pleading. Dkt. Nos. 35, 60.

Credit Suisse Group AG was, until June 12, 2023, a Swiss holding company and public corporation. *Id.* ¶ 80; Dkt. No. 29. On that date, by order of the Government of Switzerland, it merged with and into UBS Group AG ("UBS") and ceased to exist. Dkt. No. 29; Opp. Memo, at 4. Prior to Credit Suisse's dissolution, Credit Suisse was one of Switzerland's two largest and best-known banking corporations. Its business involved asset management, capital markets, international wealth management, investment banking, and private banking, in addition to other types of financial services. Compl. ¶ 82.

Credit Suisse operated worldwide via Credit Suisse AG, a Swiss corporation which used to be Credit Suisse's wholly owned subsidiary. *Id.* ¶¶ 80, 450. Currently, Credit Suisse AG is wholly owned by UBS, which is also a Swiss Corporation. *Id.* ¶¶ 34, 242; Dkt. No. 71.

Neither Credit Suisse AG nor UBS is a defendant in this case. The "Credit Suisse U.S. Entity Defendants" are the four corporations that were at all relevant times subsidiaries of Credit Suisse AG: Credit Suisse Holdings (USA), Inc.; Credit Suisse Securities (USA) LLC; Credit Suisse Capital LLC; and Credit Suisse Management LLC. Compl. ¶¶ 83–84. All four Credit Suisse U.S. Entity Defendants are Delaware corporations with their principal places of business in New York. *Id.* ¶ 83. It was through these corporations that Credit Suisse allegedly managed its operations in the United States. *Id.* ¶ 84.

Plaintiffs allege that the Credit Suisse U.S. Entity Defendants employed many of the Credit Suisse Individual Defendants. *Id.* ¶ 84. Other Credit Suisse Individual Defendants were directors of the Credit Suisse U.S. Entities. *Id.* ¶¶ 84–85. Plaintiffs allege that the Credit Suisse U.S. Entity Defendants all participated in, or were used by, the Credit Suisse Individual Defendants as agents and/or as instrumentalities in their mismanagement of Credit Suisse and violations of their statutory duties of due care. *Id.* ¶ 84.

### ii. The Credit Suisse Individual Defendants[2]

The Credit Suisse Individual Defendants identified in the Complaint include 29 current and former Credit Suisse Officers and Directors. Some of these individuals were also members of Credit Suisse Group AG's Executive Board (the "Executive Board" or "Officer Defendants") and of Credit Suisse's Board of Directors (the "Board" or "Director Defendants"). *Id.* ¶ 1. These were the governing Boards of the Swiss corporation, Credit Suisse Group AG – not the U.S. Entities, which were merely wholly owned subsidiaries of Credit Suisse AG, which was a wholly owned subsidiary of Credit Suisse Group AG.

Plaintiffs allege that each of the Credit Suisse Individual Defendants "participated in the mismanagement of Credit Suisse directly and/or as 'instigators, perpetrators, and accomplices,' and they each improperly benefited personally from improper, excessive and illegal bonuses and other illicit compensation schemes." *Id.* ¶ 116. Plaintiffs further allege that the Credit Suisse Individual Defendants were "acting as employees, officers, directors and/or agents of Credit Suisse Group AG and one or more of its New York based subsidiaries" and "utilized the Credit Suisse entities named as Defendants as their agents and/or instrumentalities to carry out their mismanagement of Credit Suisse." *Id.* ¶ 116. Plaintiffs state that "each of the individual Directors and Officers named as defendants violated their individual duties of due care,

---

[2]   In the memorandum of law in support of the motion to dismiss filed by the "Credit Suisse Defendants," Dkt. No. 87, the Credit Suisse Defendants write that the document was submitted on behalf of the "The Credit Suisse-affiliated entity and individual defendants identified in the notice of motion." In their notice of motion, Dkt. No. 86, dated September 22, 2023, the Credit Suisse Defendants informed the Court that Plaintiffs have not served several of the individual defendants – Romeo Cerutti, Noreen Doyle, Urs Rohner, and Albert Sohn – and that the Credit Suisse Defendants' counsel was not authorized to accept or waive service of the Complaint on their behalf. *Id.* On December 15, 2023, this court signed a stipulation and order stating that: Doyle's counsel accepted service of the Complaint on her behalf; and Defendant Doyle joined all of the Credit Suisse Defendants' arguments for dismissal. Dkt. No. 123. To date, Cerutti, Rohner, and Sohn have not joined the Credit Suisse Defendants' motion to dismiss. Dkt. No. 86. There is no indication in the record that any of these three individuals has been served. In a declaration submitted by the Credit Suisse Defendants in support of their motion to dismiss, Cerutti and Rohner are said to currently reside in Switzerland. Belzer Decl. ¶ 8. The Credit Suisse Defendants did not provide the Court with information about Sohn's current residence.

diligence, prudence and loyalty, and the Credit Suisse Code of Conduct in overseeing those corporate entities or managing those parts of the business which were their responsibility." *Id.* ¶ 117.

### 1.  The Credit Suisse Officer Defendants

Credit Suisse's Executive Board consisted of its executive officers; collectively, they were responsible for Credit Suisse's overall management. *Id.* ¶ 224. The Executive Board's main duties included establishing Credit Suisse's strategic business plans and regularly reviewing and coordinating significant initiatives, projects, and business developments in the divisions and corporate functions, including important risk management matters. *Id.* ¶ 225.

The Credit Suisse Officer Defendants include the following members of Credit Suisse Group AG's Executive Board: David R. Mathers; Lydie Hudson; James Amine; Timothy O'Hara; Robert Shafir; Lara Warner; Pamela Thomas-Graham; Sean Brady; Robert Jain; Philip Vasan; Brady Dougan; Eric Varvel; John Popp; Brian Chin; Jay Kim; Albert Sohn; David Miller; and Romeo Cerutti. *Id.* ¶¶ 98–115.

In the Complaint, Plaintiffs link only some of the Credit Suisse Officer Defendants to the Credit Suisse U.S. Entity Defendants. From 2010–2015, Amine was a member of the Executive Board of Credit Suisse Holdings (USA) Inc., and from 2014–2019, he was a member of the Board of Directors of Credit Suisse Holdings (USA), Inc. and Credit Suisse Securities (USA) LLC. *Id.* ¶ 100. From 2012–2016, O'Hara was President and CEO of Credit Suisse Securities (USA) LLC. *Id.* ¶ 101. From 2019 onward, Warner was a member of the Board of Credit Suisse Holdings (USA), Inc. and Credit Suisse Securities (USA) LLC. *Id.* ¶ 103. Varvel was the President and CEO of Credit Suisse Holdings (USA), Inc. *Id.* ¶ 109. Chin served on the Board of Credit Suisse Holdings (USA), Inc. and Credit Suisse Securities (USA) LLC. *Id.* ¶ 111. From 1996–2018, Sohn

headed Credit Suisse Securities.[3] *Id.* ¶ 113. Since 2019, Miller has been a member of the Board of Credit Suisse Holdings (USA), Inc. and Credit Suisse Securities (USA) LLC. *Id.* ¶ 114.

### 2. The Credit Suisse Director Defendants

The Credit Suisse Director Defendants include the following members of Credit Suisse Group AG's Board of Directors: Noreen Doyle; Richard Thornburgh; Seraina Macia; Michael Klein; Mirko Bianchi; Joaquin Ribeiro; Urs Rohner; John Tiner; Severin Schwan; Iris Bohnet; and Kaikhushru Nargolwala. *Id.* ¶¶ 87–97.

Plaintiffs have pled limited facts in support of their contention that many of the Credit Suisse Director Defendants were employed by the Credit Suisse U.S. Entity Defendants. In fact, Plaintiffs only identify two of the Credit Suisse Director Defendants as having specific roles at any of the Credit Suisse U.S. Entity Defendants. From 2015–2018, Thornburgh was a Member of the Board and Chair of Credit Suisse Holdings (USA), Inc. and Credit Suisse Securities (USA), LLC. *Id.* ¶ 88. From 2015–2021, Tiner was a member of the Board of Credit Suisse Holdings (USA), Inc. and Credit Suisse Securities (USA), LLC. *Id.* ¶¶ 94, 116.

### iii. The KPMG Defendants

### 1. Defendant KPMG LLP

Plaintiffs describe Defendant KPMG LLP ("KPMG LLP" or the "KPMG Entity Defendant")[4] as a Delaware limited liability partnership headquartered in New York City that was Credit Suisse Group AG's external statutory auditor, accountant, consultant, and advisor for over

---

[3]    It is unclear from the Complaint if "Credit Suisse Securities" is the same entity as Credit Suisse Securities (USA) LLC.

[4]    At the beginning of the Complaint, Plaintiffs define the term "KPMG" to mean the New York-headquartered KPMG LLP. Compl. ¶ 1. Within this decision and order, that entity will be referred to as KPMG LLP.

15 years. *Id.* ¶¶ 119, 121, 411–412. Plaintiffs claim that, in 2020, Credit Suisse Group AG replaced KPMG LLP with PricewaterhouseCoopers ("PwC"). *Id.* ¶ 411.

Plaintiffs state that KPMG LLP consistently certified Credit Suisse's financial statements, the legitimacy of its reported profits, and the adequacy of its internal controls. *Id.* Plaintiffs also claim that KPMG LLP was involved in managing Credit Suisse's business, its internal accounting, and financial controls, and its worldwide legal, regulatory, and compliance controls. *Id.* ¶¶ 121, 412.

### 2.  The KPMG Individual Defendants

Plaintiffs have also sued 11 KPMG LLP U.S.-based partners, employees, and related individuals who allegedly acted as Credit Suisse's statutory external auditors, accountants, consultants, and advisors. *Id.* ¶¶ 1, 152. Plaintiffs assert that the KPMG Individual Defendants "knew that Credit Suisse's controls were materially defective and inadequate and had been so for many years, that its Code of Conduct was being violated, and that one could not properly manage Credit Suisse with defective controls or lack of enforcement of the Code of Conduct." *Id.* ¶ 123.

The KPMG Individual Defendants include: William Thomas, Paul Knopp, Laura Newinski, Larry Bradley, John B. Veihmeyer, Scott Marcello, Thomas Whittle, and David Middendorf. *Id.* ¶¶ 124, 127–29.

The remaining KPMG Individual Defendants include individuals who previously held roles at the Public Company Accounting Oversight Board ("PCAOB") and who are alleged to have connections to KPMG LLP: Brian Sweet, Cynthia Holder, and Jeffrey Wada. *Id.* ¶¶ 130–32. Plaintiffs explain that Sweet, Holder, and Wada were named as Defendants "based on their stealing the list of the PCAOB as to the KPMG [LLP] audits to be reviewed, leaving their PCAOB positions for lucrative ($500,000+ per year) professional positions with KPMG in New York." *Id.* ¶ 126.

### 3.  The KPMG RICO Defendants

Plaintiffs have designated the following individuals as the KPMG RICO Defendants: Holder, Marcello, Middendorf, Sweet, Wada, and Whittle. *Id.* ¶ 436; RCS, at 15. Plaintiffs explain that the KPMG RICO Defendants are the KPMG LLP New York-based Partners who allegedly: were involved with Credit Suisse in New York; were "at the center of the 'steal the list' scandal" (the "Steal the List Scandal"), and "exploited and benefited from their participation in the RICO wrongdoing and conspiracy. RCS, at 15.

## II.    Factual Allegations

The facts below are drawn from the allegations in the Complaint and the RICO Case Statement and are presumed to be true for purposes of the motions to dismiss.

### a.  Credit Suisse's Collapse

After over one hundred years of operations as a financial institution, Compl. ¶ 80, Credit Suisse collapsed in March 2023. *Id.* ¶¶ 139, 176, 387. Plaintiffs characterize the events leading to that collapse as "one of the worst instances of financial and operational misconduct and mismanagement of a large public financial company in history." *Id.* ¶ 15.

It is Plaintiffs' position that this collapse was brought about by "20 years of ***continuous mismanagement*** by the Credit Suisse Defendants, with the active complicity of KPMG [LLP], as external auditor," *id.* ¶ 11 (emphasis in original) – not by "extraneous events, *i.e.*, economic or financial market factors/disruptions, or the acts of third parties." *Id.* ¶ 10. Plaintiffs have alleged that the Credit Suisse Individual Defendants allowed the company "to operate with '***materially deficient***' internal financial/accounting controls, legal/regulatory/compliance controls and risk management systems/procedures." *Id.* ¶ 13 (emphasis in original). Plaintiffs

state that "[w]ithout KPMG [LLP]'s 'clean' opinions including the adequacy of internal controls, Credit Suisse could not operate." *Id.* ¶ 412. Plaintiffs assert that "*[t]he worst, and most extensive wrongdoing – mismanagement, lack [of] oversight and inadequate controls – took place in Credit Suisse's New York operations.*" *Id.* ¶ 30 (emphasis in original).

According to Plaintiffs, "because of the Credit Suisse Defendants' continuing misconduct, including a knowing lack of oversight and 'systematic supervisory failures,' permitting a 'corrupt culture,' and the failure to implement necessary control systems and risk management procedures, Credit Suisse became embroiled in an endless train of scandals, investigations, lawsuits, prosecutions and regulatory proceedings in New York and elsewhere in the United States." RCS, at 12. Plaintiffs claim that "[t]he constant victims of this pattern of misconduct permitted by Defendants' negligent oversight and lack of controls were Credit Suisse's shareholders who were damaged as Credit Suisse's stock declined in price, ending up at $2.01 per share." Compl. ¶ 447.

Beginning with events that took place in 2008, Plaintiffs detail "years of mismanagement permitting illegal, improper, and wasteful conduct," *id.* ¶ 227, in the Complaint and RICO Case Statement. They cite the examples that follow in their description of the RICO predicate acts.

### b. Examples of Alleged Misconduct

Plaintiffs state that "[t]he damage/losses suffered by Credit Suisse's shareholders over past years . . . originated with the 2007-2008 subprime toxic loan scandal" (the "RMBS Scandal"). *Id.* ¶ 388. Plaintiffs claim that the "toxic" securities scandal in Credit Suisse's New York investment bank involved acts of bank, mail, and wire fraud and led to billions in losses, penalties, and fines, in addition to civil actions and criminal proceedings against individual Credit Suisse bankers for violations of federal securities laws. *Id.* ¶¶ 74, 170, 453, 456–57.

Plaintiffs state that the Credit Suisse Investment Banking officials made "false and irresponsible representations about residential mortgage-backed securities resulting in the loss of billions of dollars, which took a painful toll on the lives of ordinary Americans." *Id.* ¶ 53 (internal quotation marks omitted). In as recently as 2017, Credit Suisse paid $5.28 billion fine in connection with its sale of toxic subprime mortgage-backed securities. *Id.* ¶¶ 53, 299, 395.

In another "scandal" mentioned by Plaintiffs, the FOREX Trading Scandal, from at least 2008 to 2015, Credit Suisse's Investment Banking officials allegedly "manipulated and rigged FOREX currency trading," committing unspecified acts of financial institution, mail, and wire fraud in connection therewith. *Id.* ¶¶ 52, 438; RCS, at 4. Credit Suisse foreign exchange traders are said to have participated in electronic chat rooms where they discussed coordinating trading activity and attempted to manipulate currency prices or benchmark rates. RCS, at 4. Credit Suisse was fined $135 million for the "unlawful, unsafe, and unsound" practices in its FOREX exchange business in New York in 2017. Compl. ¶ 459.

Plaintiffs also mention Credit Suisse's December 2009 criminal pleas and agreements with the U.S. Department of Justice and the Manhattan District Attorney's Office for evading terrorist sanctions on illegal money transfers to Iran, Sudan, and others. *Id.* ¶ 450. Credit Suisse paid a $536 million penalty for this misconduct, which encompassed unspecified acts of mail and wire fraud, as well as money laundering. *Id.* ¶¶ 450, 452. Those acts necessarily took place prior to the dates of the plea agreements.

Plaintiffs reference the United States Tax Evasion Scandal; they say that Credit Suisse, taking advantage of Swiss banking secrecy laws, illegally assisted tax evasion by U.S. taxpayers. This conduct is alleged to have begun in 1953 and never ceased. *Id.* ¶¶ 77, 461; RCS, at 4. Between 2011 and 2014, at least eight Credit Suisse bankers pled guilty to aiding and abetting

U.S. taxpayers who were illegally evading payment of their taxes. Compl. ¶¶ 39, 461; RCS, at 5. In 2014, Credit Suisse pled guilty to illegal tax evasion assistance and paid a $2.6 billion fine; in the accompanying DOJ press release, the DOJ referenced acts of bank, mail, and wire fraud and visa violations that occurred in connection with this scandal. Compl. ¶ 462; RCS, at 6–7. In March 2023, the United States Senate concluded that Credit Suisse had engaged in activities that violated and breached the 2014 plea agreement by continuing to assist United States-based tax evaders out of its New York office. Compl. ¶ 44.

Plaintiffs also cite to the Princelings "pay off" scandal, which involved bank, mail, and wire fraud and consisted of a scheme to corruptly win banking business by awarding employment to the friends and family of Chinese officials. *Id.* ¶ 466. According to a 2018 DOJ press release, Credit Suisse was required to pay $47 million to the DOJ and over $30 million to the SEC as a result. *Id.*

Another example of misconduct provided by Plaintiffs is the 2019 Tuna Boats/Bonds scandal in which Credit Suisse Investment Bank officials, "acting within the scope of their employment, concocted a brazen, internal criminal scheme ostensibly to fund a self-sustaining tuna fishing industry in" Mozambique. *Id.* ¶¶ 20, 340 (internal quotation marks omitted). Those officials have since pled guilty to criminal conspiracy, which included acts of wire fraud and money laundering, in the Eastern District of New York. *Id.* ¶ 64; RCS, at 8. The scheme involved an $850 million loan by Credit Suisse supposedly to establish a tuna fishing fleet; the majority of the loan money was instead diverted and siphoned off for bribes and kickbacks. Compl. ¶ 314.

Plaintiffs also claim that the "Credit Suisse Individual Defendants received millions of shares of Credit Suisse stock as part of their unjustified, indeed illegal, lavish compensation, as

well as part of looting and plundering the bank, abusing their control of its assets, monies, and securities." *Id.* ¶ 473. They characterize this as "financial institution bank fraud."

According to Plaintiffs, "[k]ey to the ongoing illegal course of conduct and conspiracy alleged was the ongoing participation of KPMG [LLP], which included KPMG [LLP]'s criminal conduct – KPMG [LLP] 'stealing the list' of KPMG [LLP] audits to be reviewed by the [Public Company Accounting Oversight Board] so KPMG [LLP] could destroy and alter the audit workpapers of those audits to "dress up" the involved audits to pass inspection." *Id.* ¶ 479. Plaintiffs allege that the list of KPMG LLP audits to be reviewed included Credit Suisse. *Id.* In order to avoid having the Public Company Accounting Oversight Board discover deficiencies at Credit Suisse, KPMG LLP and its top New York partners "secretly and illegally altered the Credit Suisse audit workpapers to cover up deficiencies as to internal accounting/financial and regulatory/legal compliance controls and risk management procedures." *Id.* This conduct is alleged to have occurred between 2015 and 2017. *Id.* ¶ 417.

### c. Acts of Mismanagement

Aside from the facts of any particular scandal involving Credit Suisse, Plaintiffs allege that "Credit Suisse's Directors and Officers have followed a predictable course of action," *id.* ¶ 340: whenever there was conduct leading to scandals, fines, pleas, settlements, and convictions, that underlying conduct was "said to have occurred without knowledge or notice of the Directors – the people with a legal duty for ***overall management of the company***, who are required to perform their duties with ***all due diligence in particular with regard to compliance with the law***." *Id.* ¶ 341 (emphasis in original, internal quotation marks omitted).

Plaintiffs allege that the Credit Suisse Defendants and KPMG LLP repeatedly breached their duties under Swiss law to act with due care, diligence, prudence, and loyalty to Credit Suisse

shareholders. *Id.* ¶ 347. Plaintiffs assert that the Credit Suisse Defendants and KPMG LLP failed to: take required steps to assure that Credit Suisse had effective internal controls; oversee and assure regulatory and legal compliance; supervise and control Credit Suisse executives and employees in Investment Banking operations to prevent reckless, improper, and unlawful conduct; protect Credit Suisse and its shareholders against loss and damage; pursue legal claims against Credit Suisse officials for violations of duties; prevent and/or take proper action to recover millions in inflated bonuses; obtain and then act on adequate information after due inquiry to properly discharge their duties and responsibilities; supervise and/or control Credit Suisse's top executives; assure that Credit Suisse's financial statements were accurate; and investigate apparent wrongdoing inside Credit Suisse. *Id.*

According to Plaintiffs, "[w]ith due care, due diligence and effective internal accounting and legal compliance controls and honest stewardship, the collapse of Credit Suisse would not have occurred and the shareholders would not have been damaged." *Id.* ¶ 352.

## III.   Procedural History

Stevenson and Lawtone-Bowles filed their lawsuits on May 30, 2023 and June 7, 2023, respectively. Dkt. No. 2. The two actions were consolidated and an amended class action complaint, alleging three causes of action, was filed on July 14, 2023. Dkt. No. 33; Dkt. No. 60.

Count I of the Complaint is asserted against the Credit Suisse Defendants and KPMG Defendants, including KPMG LLP and the KPMG Individual Defendants. It alleges breaches of the statutory duties owed by Defendants to Credit Suisse's shareholders under Swiss law. Specifically, Plaintiffs claim that Defendants violated and are liable under Arts. 41, 42, 50, 55, 716(a), 754, 755, and 759 of the Swiss Code of Obligations. Compl. ¶ 431. Plaintiffs assert that:

the Credit Suisse Defendants and KPMG Defendants, acting individually and jointly, and as instigators, perpetrators, accomplices, assistors and abettors in a civil conspiracy, breached their duties to Credit Suisse's shareholders and under Swiss law, including their duties of due care, diligence, prudence, and loyalty, as well as their duty to secure compliance with the Credit Suisse Code of Conduct, Corporate Charter, and other requirements. *Id.* ¶ 430. Plaintiffs claim that through the Credit Suisse Defendants and KPMG LLP's participation in the mismanagement of Credit Suisse, they damaged Credit Suisse's shareholders. *Id.*

Significantly, there is no claim that the Credit Suisse U.S. Entity Defendants were mismanaged in violation of any U.S. law.

Count II alleges a substantive RICO claim under 18 U.S.C. § 1962(b) against the Credit Suisse Defendants, KPMG LLP, and the KPMG RICO Defendants (together, the "RICO Defendants"). Count III alleges that the RICO Defendants conspired under 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(b). Plaintiffs claim that the Credit Suisse U.S. Entity Defendants and KPMG LLP formed a RICO Enterprise in that they worked together to violate laws, commit RICO predicate acts, and obtain billions in revenue, benefiting each of the individual defendants. *Id.* ¶ 442. Plaintiffs base their RICO claims on the alleged racketeering activities detailed throughout the Complaint, including "repeated violations of the mail, wire and financial institution/bank fraud statutes, and violations of visa/immigration and money laundering prohibitions of United States law." *Id.* ¶ 438. According to Plaintiffs, "[a]s a direct and proximate result of Defendants' racketeering activities . . . plaintiff[s] and the Class have been injured in their business and property, *i.e.*, ownership of Credit Suisse common stock, which sold for just $2.01 per share at the end of the Class Period, compared to $33.84 per share at the

beginning of the Class Period" – or $2.01 per share on March 17, 2023, as compared to $33.84 per share on October 22, 2013. *Id.* ¶¶ 8, 481.

On September 22, 2023, the Defendants submitted their various motions to dismiss, challenging the Complaint on various grounds. The Credit Suisse Defendants moved to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6) and moved to dismiss Plaintiffs' Swiss law claim under the doctrine of *forum non conveniens*. Dkt. No. 86. Some of the Credit Suisse Individual Defendants – Bianchi, Bohnet, Dougan, Macia, Mathers, Nargolwala, Ribeiro, Schwan, Tiner, and Warner – also moved for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(2), for want of personal jurisdiction over them. *Id.* Bradley, Thomas, and Veihmeyer moved for dismissal pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), for want of personal jurisdiction and failure to state a claim. Dkt. No. 68. Holder, Marcello, Middendorf, Sweet, and Whittle moved for dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Dkt. No. 79. KPMG LLP, Knopp, and Newinski submitted a further memorandum of law in support of the Credit Suisse Defendants' motion to dismiss. Dkt. No. 82. Wada moved for dismissal pursuant to Federal Rule of Procedure 12(b)(6). Dkt. No. 90. All Defendants joined in the Credit Suisse Defendants' motion to dismiss.

For the reasons discussed below, the motions to dismiss the RICO claims (Counts Two and Three) pursuant to Fed. R. Civ. P. 12(b)(6) are granted. The motion to dismiss the Swiss law claim (Count One) on the ground of *forum non conveniens* is granted conditionally.

## DISCUSSION

### I.      Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556). The Court must accept all factual allegations as true and draw all reasonable inferences in plaintiffs' favor. *ATSI Commc'ns., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations, citations, and alterations omitted). Thus, unless a plaintiff's well-pleaded allegations have "nudged [its] claims across the line from conceivable to plausible, [the plaintiff's] complaint must be dismissed." *Id.* at 570; *Iqbal*, 129 S. Ct. at 1950–51.

## II.    Plaintiffs' RICO Claims Are Dismissed With Prejudice and Without Leave to Replead

The only federal claims alleged in the Complaint arise under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq. ("RICO"). Plaintiffs plead a substantive RICO claim under 18 U.S.C. § 1962(b) against the RICO Defendants, as well as a claim that the RICO Defendants conspired under 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(b), causing injury to Plaintiffs and their proposed class's business or property – their ownership of Credit Suisse common stock. 18 U.S.C. § 1964(d); Compl. ¶¶ 481, 486.

RICO provides for civil and criminal liability for entities engaged in "a pattern of racketeering activity." 18 U.S.C. §§ 1962(a)–(d), 1964. To plead a viable civil RICO claim under 18 U.S.C. § 1962(b), a plaintiff must sufficiently allege "(1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise,' (7) the activities of which affects interstate or foreign commerce." *Moss v. Morgan Stanley*, 719 F.2d 5, 17 (2d Cir. 1983), *cert. denied*, 465 U.S. 1025 (1984); *see Zuhovitzky v. UBS AG CHE 101.329.562*, No. 21 Civ. 11124, 2023 WL 4584452, at *10 (S.D.N.Y. July 18, 2023). A plaintiff must also allege that he was "injured in his business or property by reason of a violation of section 1962." *Moss*, 719 F.2d at 17 (quoting 18 U.S.C. § 1964(c)).

To establish the existence of a RICO conspiracy under 18 U.S.C. § 1962(d), a plaintiff must prove "the existence of an agreement to violate RICO's substantive provisions." *Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 244 (2d Cir. 1999) (citations omitted).

"Courts generally approach RICO claims with caution, understanding that Congress's goal in enacting the RICO statute was to prevent legitimate businesses from becoming infiltrated by organized crime, although the statute's reach is not limited to mobsters." *One World, LLC v. Onoufriadis*, No. 20 Civ. 5802, 2021 WL 184400, at *7 (S.D.N.Y. Jan. 19, 2021) (citing *United States v. Porcelli*, 856 F.2d 1352, 1362 (2d Cir. 1989)). "Because the mere assertion of a RICO claim has an almost inevitable stigmatizing effect on those named as defendants, courts should strive to flush out frivolous RICO allegations at an early stage of the litigation." *U.S. Fire Ins. v. United Limousine Serv., Inc.*, 303 F.Supp.2d 432, 443 (S.D.N.Y. 2004) (citation omitted).

The Credit Suisse Defendants, KPMG LLP, and the KPMG RICO Defendants have moved to dismiss Plaintiffs' RICO claims. Despite Plaintiffs' contention that their RICO claims "meet

any applicable pleading test," the Court finds that Plaintiffs' RICO claims are deficient on a number of grounds, only some of which will be discussed here.

### a. Plaintiffs Lack Standing to Bring Their RICO Claims

To establish standing to bring a civil RICO claim, a plaintiff must show the following: (1) a violation of Section 1962; (2) an injury to the plaintiff's business or property; and (3) that the defendant's violation was the proximate cause of the plaintiff's injury. *Baisch v. Gallina*, 346 F.3d 366, 372 (2d Cir. 2003) (citing *Lerner v. Fleet Bank, N.A.*, 318 F.3d 112, 120–24 (2d Cir. 2003)); *see Alphas Co. of N.Y. v. Hunts Point Terminal Produce Coop.*, No. 1:14-cv-00145, 2017 WL 1929506, at *3 (S.D.N.Y. May 9, 2017).

In this case, as the Credit Suisse Defendants point out in their moving papers, Plaintiffs' "theory of harm is clear – [they] claim[] from the outset that Defendants' alleged mismanagement caused the price of Credit Suisse Group AG securities to decline" from $33.84 per share at the beginning of the Class Period to just $2.01 per share at the end of the Class Period. *See* Compl. ¶¶ 3, 4, 8, 10, 39, 323, 481. The RICO predicate acts – every one of them – is alleged to have been part of the mismanagement of Credit Suisse, which mismanagement led to the injury allegedly suffered by Plaintiffs. Unfortunately for Plaintiffs, they lack standing to assert any such claim when what they seek is the diminution in the value of their investment in securities.

"Courts routinely refuse to permit shareholders to recover for alleged diminution in the value of their corporate stock." *Abate v. Fifth Third Bank*, No. 13-cv-9078, 2018 WL 1569260, at *6 (S.D.N.Y. Mar. 27, 2018); *see Toto v. McMahan, Brafman, Morgan & Co.*, No. 93 CIV. 5894, 1997 WL 458764, at *4 (S.D.N.Y. Aug. 11, 1997); *Nordberg v. Lord, Day & Lord*, 107 F.R.D. 692, 698 (S.D.N.Y. 1985). "Shareholder injuries deriving from diminution of corporate

assets are an injury quintessentially remediable by shareholders only through a derivative action." *Strougo v. Bassini*, 282 F.3d 162, 169 (2d Cir. 2002). An action is derivative – instead of direct – "if the gravamen of the complaint is injury to the corporation, or to the whole body of its stock or property without any severance or distribution among individual holders." *Nordberg*, 107 F.R.D. at 697 (internal quotations omitted).

"A shareholder generally does not have standing to bring an individual action under RICO to redress injuries to the corporation in which he owns stock . . . . Since the shareholder's injury, like that of the creditor, generally is derivative of the injury to the corporation, the shareholder's injury is not related directly to the defendant's injurious conduct." *Manson v. Stacescu*, 11 F.3d 1127, 1131 (2d Cir. 1993) (citing *Rand v. Anaconda–Ericsson, Inc.*, 794 F.2d 843, 849 (2d Cir. 1986)); *see Freund v. Lerner*, No. 09-cv-7117, 2010 WL 3156037, at *8 (S.D.N.Y. Aug. 10, 2010); *Cook v. Spiezio*, No. 06 Civ. 5748, 2010 WL 11715049, at *3 (S.D.N.Y. Mar. 11, 2010); *Bona v. Barasch*, No. 01 Civ. 2289, 2003 WL 1395932, at *25 (S.D.N.Y. Mar. 20, 2003). "Any decrease in value of [Plaintiff's] shares merely reflects the decrease in value of the firm as a result of the alleged illegal conduct." *Rand*, 794 F.2d at 849.

Thus, by virtue of the nature of the injury Plaintiffs seek to redress, Plaintiffs' RICO claims are derivative claims – and Plaintiffs lack standing to bring them. For that reason alone, they must be dismissed with prejudice.

The Second Circuit has recognized a limited exception to *Rand*'s no-direct-standing rule in cases "in which the shareholder sustains an injury that is separate and distinct from the injury sustained by the corporation." *Manson*, 11 F.3d at 1131 (citation omitted); *see Jackson Nat. Life. Ins. v. Ligator*, 949 F.Supp. 200, 205 (S.D.N.Y. 1996). The exception applies only where: (1) the defendant breached "an independent duty [to the shareholder] that is distinguishable from the

duty owed to the corporation;" or (2) "the injury sustained by the shareholder is separate and distinct from that sustained by other shareholders." *Manson*, 11 F.3d at 1131.

Plaintiffs assert that the Class falls within the first *Rand* exception. They argue that Swiss law creates independent and distinguishable duties to a corporation and its shareholders, and insist, in their opposition papers, that they are "pursuing their direct right of action for damage to their stock due to Defendants' violation of RICO." Opp. Memo, at 32. Plaintiffs have asserted that the Credit Suisse Directors "let wrongdoers keep hundreds of millions of corporate assets and money – contributing to the financial harm to Credit Suisse which damaged the common shareholders, inflicting harm directly on them, separate from and disproportionate to any harm suffered by Credit Suisse." Compl. ¶ 369. In their opposition papers, Plaintiffs argue that the Class's injuries are "separate from and disproportionate to any harm suffered by Credit Suisse" because "Defendants' mismanagement caused Credit Suisse to pay fines and penalties on the one hand ($35 billion), and destroyed shareholder value on the other hand ($120–$360 billion) due to the decline in stock price." Opp. Memo, at 33.

But this is sophistry. *Rand* stands for the proposition that the injury suffered by shareholders in the form of diminution of share value is not separate and distinct from the injury sustained by the corporation. Here, Plaintiffs allege that the value of their securities declined because of rampant mismanagement of Credit Suisse – not because of some special duty that they were owed. Plaintiffs do not identify any other type of injury they suffered. The proposed class members allege that there were "injured only as a result of the injury of another, i.e., the corporation." *Lacertosa v. Blackman Plumbing Supply Co.*, No. 10-v-1984, 2013 WL 3728803, at *5 (E.D.N.Y. July 12, 2013); *see Manson*, 11 F.3d at 1131.

The duty under Swiss law that directors and officers have to manage the affairs of a corporation for the benefit of the shareholders – the only duty Plaintiffs identify, and the one on which they rely for their purported *Rand* exception – is identical to the statutory duty of prudent management that is also owed to the corporation. The duties are one and the same. Art. 754 of the Swiss Code of Obligations, which covers Board and business management liability, states that: "The members of the board of directors and all persons engaged in the business management or liquidation of the company are liable both to the company and to the individual shareholders and creditors for any losses or damage arising from any intentional or negligent breach of their duties."[5] Art. 755 of the same portion of the Swiss Civil Code, which covers external auditor liability, provides that: "All persons engaged in auditing the annual and consolidated accounts, the company's foundation, a capital increase or a capital reduction are liable both to the company and to the individual shareholders and creditors for the losses arising from any intentional or negligent breach of their duties." Under Plaintiffs' own reading of the Swiss statute, the duties owed to shareholders and the corporation are indistinguishable. *See Manson*, 11 F.3d at 1131.

Nonetheless, Plaintiffs insist that *Rand* is inapplicable because the Swiss Code of Obligations gives the shareholders an independent cause of action for violation of those duties. Assuming that to be true (which I do for purposes of this motion), that does not confer RICO standing on the Plaintiffs – it only allows them to pursue the claims asserted in their First Cause of Action, which are brought under Swiss law. Violations of Swiss law are not RICO predicate acts. The second and third causes of action are brought under U.S. law, and are subject to U.S. rules on standing. Under U.S. law, the type of injury for which Plaintiffs seek redress – diminution

---

[5] An English translation of Part Five: The Code of Obligations of the Swiss Civil Code can be found on the Swiss Confederation's online platform for federal law: https://www.fedlex.admin.ch/eli/cc/27/317_321_377/en, *archived at* https://perma.cc/GTM2-W37D.

in the value of their securities – can only be redressed by the corporation. Ergo, whether or not they have standing to pursue a claim under Swiss law, Plaintiffs lack RICO standing.

The only other way around *Rand* is for Plaintiffs to plead that they individually suffered injuries that differ in type from injuries suffered by anyone else. Obviously, these Plaintiffs do not satisfy that aspect of the exception, since they have brought a class action asserting injuries suffered by a large class of shareholders. Plaintiffs plead that the injuries sustained by all of the proposed class members are the same; they affirmatively allege that "all members of the Class are similarly affected by Defendants' actionable conduct" and that "Identical . . . losses/damages are involved." Compl. ¶ 207; *see Manson*, 11 F.3d at 1131.

So the fact that corporate management is liable to both the corporation and its shareholders does not mean that, by virtue of the diminution in share value, the shareholders suffer some injury that is separate and distinct from the injury to the corporation. Quite the contrary. *Lacertosa*, 2013 WL 3728803, at *5 n.4. The fact that the Swiss Code of Obligations characterizes these duties as "non-transferable" and "inalienable," Swiss Code of Obligations Art. 716a, does not mean that the duties owed the corporation and its shareholders are "distinguishable."

In sum, Plaintiffs do not allege any injury to the shareholders that is separate and distinct from the injury suffered by the corporation; the only injury they allege is to the value of their stock, and the decline in share value is an injury that affects all shareholders and the corporation equally. As a result, it may only be raised in a derivative suit. *Baltus-Michaelson v. Credit Suisse First Boston, LLC*, 116 Fed.Appx. 308, 310 (2d Cir. 2004) (citing *Strougo*, 282 F.3d at 169).

Therefore, the RICO claim as against the Credit Suisse defendants must be dismissed.

### b. Plaintiffs Fail to State a Claim Since They Have Not Adequately Alleged A RICO Enterprise

Insofar as the Credit Suisse Defendants are concerned, we could stop there. However, Plaintiffs' RICO claims are independently subject to dismissal because Plaintiffs have failed adequately to allege the existence of a RICO enterprise. *Town of Mamakating, N.Y. v. Lamm*, No. 15-cv-2865, 2015 WL 5311265, at *9 (S.D.N.Y. Sept. 11, 2015).

To state a RICO claim, a "plaintiff must allege facts showing the existence of an enterprise." *Elsevier Inc. v. W.H.P.R., Inc.*, 692 F.Supp.2d 297, 305 (S.D.N.Y. 2010). The term "enterprise," as defined in the RICO statute, "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

The Supreme Court has explained that a RICO enterprise consists of "'a group of persons associated together for a common purpose of engaging in a course of conduct,' the existence of which is proven 'by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'" *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)). "[T]he enterprise must be engaged in, or the activities of the enterprise must affect, interstate or foreign commerce." *First Cap. Asset Mgmt., Inc.*, 385 F.3d at 173 n.12 (citing 18 U.S.C. § 1962).

At minimum, where a plaintiff alleges an association-in-fact enterprise, that enterprise must have "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). "To satisfy the first 'purpose' feature, the individuals that [compose] the enterprise 'must share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes.'" *New York v. United*

*Parcel Serv., Inc.*, No. 15-cv-1136, 2016 WL 4203547, at *3 (S.D.N.Y. Aug. 9, 2016) (quoting *First Cap. Asset Mgmt.*, 385 F.3d at 174). "To satisfy the second feature, a plaintiff must demonstrate the relationships between the various members and their roles in the purported RICO scheme." *Id.* (citations omitted). There must also be a nexus between the enterprise and the racketeering activity that is being conducted. *First Cap. Asset Mgmt., Inc.*, 385 F.3d at 174 (citing *United States v. Indelicato*, 865 F.2d 1370, 1384 (2d Cir. 1989)).

Here, the alleged RICO enterprise is the "Credit Suisse Enterprise," an association-in-fact consisting of "the Credit Suisse New York-based subsidiaries and New York-based KPMG [LLP] sued as defendants," Compl. ¶ 442, that was engaged in interstate or foreign commerce. *Id.* ¶ 445; RCS, at 23. Plaintiffs assert that the Credit Suisse U.S. Entity Defendants, Credit Suisse Individual Defendants, KPMG LLP, and the KPMG RICO Defendants were each associated with the Credit Suisse Enterprise. RCS, at 25. According to Plaintiffs:

> The joint action of Credit Suisse and its external auditor, KPMG [LLP], was necessary for the enterprise to exist and act . . . . Neither could successfully operate without the other. Credit Suisse could not operate without audited, certified financial statements, assuring adequacy of internal controls and risk management procedures. They were mutually interdependent. Working together they violated laws, committed RICO predicate acts and obtained billions in revenues for the Credit Suisse Defendants and the KPMG Defendants, personally benefiting each of the Individual Defendants.

Compl. ¶ 442. From the pleadings, Plaintiffs seem to indicate that the shared purpose of the Credit Suisse Enterprise was the personal economic benefit of each of the Individual Defendants. *Id.* ¶ 442; RCS, at 23.

The Credit Suisse Defendants advance three reasons in support of their argument that the Complaint fails to adequately allege a RICO enterprise: (1) Plaintiffs do not adequately plead the requisite interpersonal relationships among the Credit Suisse Enterprise's members; (2) Plaintiffs

make irreconcilably inconsistent allegations; and (3) Plaintiffs do not adequately allege that the supposed enterprise members had a common purpose or a common interest. The Court agrees with the Credit Suisse Defendants' reasoning.

First, not pleading interpersonal connections between most – or all – of the Defendants is a fatal defect in Plaintiffs' Complaint. *See Town of Mamakating, N.Y.*, 2015 WL 5311265, at *9 (S.D.N.Y. Sept. 11, 2015); *Abbott Laboratories v. Adelphia Supply USA*, No. 15-cv-5826, 2017 WL 57802, at *4 (E.D.N.Y. Jan. 4, 2017). The Complaint does not explain the relationships between each of the members of the alleged Credit Suisse Enterprise. Instead, Plaintiffs make the conclusory assertion that "the KPMG Defendants were closely associated with Credit Suisse for decades" since "KPMG was Credit Suisse's statutory auditor and accountant for some 20 years." Compl. ¶ 6. However, as the Credit Suisse Defendants point out in their moving papers, "even though Plaintiff[s] premise[] the so-called 'enterprise' on the relationship between a company and its auditor, neither the company nor its auditor are even alleged to be in the supposed enterprise." That is correct. Credit Suisse Group AG, the audited company, *see* Exs. 1–3 to Barry Decl., is not a defendant and is not alleged to be a member of the Credit Suisse Enterprise. And as will be discussed more fully below, *see infra* pp. 31, New York based KPMG LLP – the only KPMG entity named in the Complaint as a member of the enterprise – was not the entity that audited Credit Suisse Group AG. *See* Exs. 1–3 to Barry Decl. "Because each KPMG . . . member firm operates independently and is a distinct legal entity," the KPMG entity that Plaintiffs sued could have possibly been part of the alleged Credit Suisse Enterprise. *In re Certain Funds*, No. 14 Civ. 1801, 2014 WL 3404955, at *5 (S.D.N.Y. July 9, 2014), *aff'd* 798 F.3d 113 (2d Cir. 2015).

In a possible attempt to provide facts that illuminate the relationships between the entities that are alleged to comprise the Credit Suisse Enterprise, Plaintiffs state, in wholly conclusory

fashion, that "KPMG's New York offices were all but part of Credit Suisse, whose offices were physically close by." Compl. ¶ 122. Unidentified KPMG personnel are alleged to have been "constantly inside Credit Suisse's New York operations working with several different aspects of the management of Credit Suisse's business — including its financial, accounting and compliance controls, its IT systems, as well as the Code of Conduct." *Id.* And, "One or more of the four Credit Suisse New York entities and/or KPMG LLP and/or other KPMG entities are involved in the Credit Suisse audits and are thus associated in fact." RCS, at 24.

However, as argued by the Credit Suisse Defendants, Plaintiffs do not "explain how or why the supposed *enterprise members* worked together." Plaintiffs' conclusory allegations are far from "concrete factual assertions as to the mechanics of the interactions among defendants, including facts indicating that the disparate defendants functioned as a unit." *Cont'l Petroleum Corp. v. Corp. Funding Partners, LLC*, No. 11 Civ. 7801, 2012 WL 1231775, at *6 (S.D.N.Y. Apr. 12, 2012).

Second, the inconsistencies about the enterprise in Plaintiffs' submissions cannot be ignored, as they are "flatly contradictory." *Jones-Cruz v. Rivera*, No. 19 Civ. 6910, 2022 WL 20437017, at *10 (S.D.N.Y. Oct. 28, 2022). For example, as the Credit Suisse Defendants point out, Plaintiffs allege that "[d]efendants . . . are employed by or associated with the enterprise," RCS, at 24, but also claim that "The Credit Suisse entities, Credit Suisse Individual Defendants, KPMG LLP and the KPMG RICO Defendants are each associated with the enterprise but not employed by it. The association in fact enterprise has no employees." *Id.*, at 25. "Contradictory factual allegations of this sort are indicative of a failure to plead a plausible claim." *Jones-Cruz*, 2022 WL 20437017, at *10 (citation omitted).

And finally, Plaintiffs' allegations as to the shared purpose of the members of the alleged Credit Suisse Enterprise are deficient, as "no alleged facts support an inference that the entities were acting in any way but in their own independent interests." *Abbott Laboratories*, 2017 WL 57802, at *4. Nowhere in the pleadings do Plaintiffs identify the common purpose among the purported members of the alleged Credit Suisse Enterprise. When given the express opportunity to so plead in their RICO Case Statement, Plaintiffs likewise failed to do so. *See* RCS, at 22–25. Plaintiffs claim that KPMG LLP and Credit Suisse "[w]ork[ed] together," to "violate[] laws, commit[] RICO predicate acts and obtain[] billions in revenues for the Credit Suisse Defendants and the KPMG Defendants, personally benefiting each of the Individual Defendants." Compl. ¶ 442. From this claim, a purpose – individual profit – can be inferred. But Plaintiffs' use of the word "personally" cuts against the idea that said purpose is "common." Indeed, it appears from the pleading that the KPMG members of the purported enterprise had an entirely different purpose for participation than did the U.S.-based Credit Suisse Defendants.

### c. Plaintiffs Have Not Adequately Alleged the Involvement of KPMG LLP and the KPMG RICO Defendants in Any Acts of Racketeering Activity

But let us, for purposes of argument, assume that Plaintiffs did sufficiently plead the existence of an alleged Credit Suisse Enterprise. The Complaint is nevertheless deficient in that it does not contain any factual allegations that allow the Court to infer that KPMG LLP and the KPMG RICO Defendants were involved in any acts of racketeering activity.

An enterprise engages in a pattern of racketeering activity when its members commit at least two acts of racketeering activity within a 10-year period prior to the filing of the complaint – or, for our purposes, with the period beginning May 30, 2013. *See United States v. Delgado*, 972 F.3d 63, 79 (2d Cir. 2020); *Int'l Broth. of Teamsters v. Carey*, 163 F.Supp.2d 271, 280 (S.D.N.Y. 2001). The predicate acts of racketeering activity must be related to one another, have a nexus to

the enterprise, and amount to or pose a threat of continued criminal activity. *See H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989); *Delgado*, 972 F.3d at 79; *Schlaifer Nance & Co. v. Est. of Warhol*, 119 F.3d 91, 97 (2d Cir. 1997); *Int'l Broth. of Teamsters*, 163 F.Supp.2d at 280.

"Racketeering activity" is defined as including "any act indictable under various specified statutes, and certain federal offenses," *H.J. Inc.*, 492 U.S. at 232 (quotation marks omitted); 18 U.S.C. § 1961(1), such as mail fraud; wire fraud; financial institution bank fraud; fraud and misuse of visas, permits and other documents; and money laundering. 18 U.S.C. § 1961(1). "[R]acketeering activity consists not of acts for which the defendant has been convicted, but of acts for which he could be." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 488 (1985).

The Second Circuit has repeatedly recognized that "[t]he essential elements of a mail [or wire] fraud violation are (1) a scheme to defraud, (2) money or property [as the object of the scheme], and (3) use of the mails [or wires] to further the scheme." *Fountain v. United States*, 357 F.3d 250, 255 (2d Cir. 2004) (alterations in original) (quoting *United States v. Dinome*, 86 F.3d 277, 283 (2d Cir. 1996)); *see United States v. Miller*, 997 F.2d 1010, 1017 (2d Cir. 1993). RICO claims premised on allegations of mail or wire fraud warrant particular scrutiny "because of the relative ease with which a plaintiff may mold a RICO pattern from allegations that, upon closer scrutiny, do not support it." *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 489 (2d Cir. 2014) (quoting *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000), *cert. denied*, 532 U.S. 905 (2001)). "To state a RICO claim predicated on mail or wire fraud, a complaint must 'specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements.' " *Babb v. Capitalsource, Inc.*, 588 Fed. Appx. 66, 68 (2d Cir. 2015) (summary order) (quoting *Moore v. PaineWebber, Inc.*, 189 F.3d

165, 173 (2d Cir. 1999)) (citing Fed. R. Civ. P. 9(b)). "A complaint must also identify the purpose of the allegedly fraudulent communication within the defendant's fraudulent scheme and facts that give rise to a strong inference of fraudulent intent." *Black v. Ganieva*, 619 F.Supp.3d 309, 342 (S.D.N.Y. 2022) (internal citation and quotation marks omitted).

Plaintiffs claim that the Credit Suisse Enterprise's racketeering activities include violations of the following federal statutes: Mail Fraud (18 U.S.C. § 1341); Wire Fraud (18 U.S.C. § 1343); Financial Institution Bank Fraud (18 U.S.C. § 1344); Fraud and Misuse of Visas, Permits and Other Documents (18 U.S.C. § 1546); and Money Laundering (18 U.S.C. §§ 1956–1957). RCS, at 20. In regard to KPMG LLP, Plaintiffs contend that KPMG LLP's allegedly deficient review of Credit Suisse's "inadequate internal financial/accounting controls and legal/regulatory/compliance controls" "facilitated, permitted, and rewarded criminal conduct which included acts of mail fraud, wire fraud, visa fraud, bank fraud, and money laundering that damaged Credit Suisse shareholders." *Id.*, at 22.

With respect to the KPMG RICO Defendants, Plaintiffs assert that: "key to the RICO conspiracy claim alleged against the subset of 'KPMG RICO Defendants' involved not only the 'ongoing audit' of Credit Suisse and certification of its controls and financial statements, *i.e.*, the active participation of KPMG [LLP] and the individual KPMG defendants in criminal conduct, but also 'stealing the list' of KPMG [LLP] audits to be reviewed by the Public Company Accounting Oversight Board ('PCAOB') so KPMG [LLP] could destroy and alter the audit workpapers of those audits to 'dress up' the involved audits to pass any inspection." *Id.*, at 15.

In other words, KPMG LLP and its employees are alleged to have committed fraud in connection with the audits of Credit Suisse Group AG. Their role in connection with the audits is the primary source of their alleged predicate acts.

But as the contents of the Complaint and the documents cited therein make clear, KPMG LLP, the defendant in this case, did not conduct those audits – which means Plaintiffs have sued the wrong defendant. *See Lundy v. Catholic Health Sys. of Long Island*, 711 F.3d 106, 119 (2d Cir. 2013); Fed. R. Civ. P. 9(b).

As KPMG LLP argues in its moving papers, the Complaint "refers only generically to the 'KPMG' brand, while Plaintiff[s'] actual allegations—scant as they are—relate entirely to the 'statutory auditor' role held by KPMG Switzerland" – or KPMG AG. KPMG AG "is a subsidiary of KPMG Holding AG, which is a member of the KPMG network of independent firms affiliated with KPMG International Cooperative . . . a Swiss legal entity." Ex. 1 to Barry Decl., at 254-V. Documents cited in the Complaint, as well as public filings, make it clear that Credit Suisse – a Swiss Bank – was audited for more than twenty years, from 1989 until 2020, by KPMG AG (KPMG Switzerland), not KPMG LLP (KPMG US). Compl. ¶ 6; *see* Ex. 1 to Barry Decl., at 217, 254-V; Ex. 3 to Barry Decl., at 260; Ex. 1 to Chang Decl., at 10, 17; Ex. 2 to Chang Decl., at 7, 14, 17. The two are not the same, as courts have held repeatedly. *See In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F.Supp.3d 111, 147 (S.D.N.Y. 2021); *Nuevo Mundo Holdings v. Pricewaterhouse Coopers LLP*, No. 03 Civ. 0613, 2004 WL 112948, *3 (S.D.N.Y. Jan. 22, 2004); *In re AM Int'l Inc. Sec. Litig.*, 606 F.Supp. 600, 607 (S.D.N.Y. 1985*); Reingold, v. Deloitte, Haskins & Sells*, 599 F.Supp. 1241, 1249, 1254 n.10 (S.D.N.Y. 1984).

Plaintiffs have pled nary a fact tending to show that the actions or inactions of KPMG AG – specifically its alleged failures "to police the conduct of subordinates to ensure legal compliance and adherence to the Conduct Code" and to "maintain an exemplary control and compliance culture," Dkt. No. 125; *see* Compl. ¶¶ 166, 167, 203–235; RCS at 15–16 – can be attributed to Defendant KPMG LLP, its affiliate in the United States. Additionally, Plaintiffs have not pled any

31

facts to support an inference that KPMG LLP – or the KPMG RICO Defendants – provided any support for KPMG AG's audits of Credit Suisse. And specifically regarding the KPMG RICO Defendants, Plaintiffs state that they are "named as defendants based on their stealing the list of the PCAOB as to the KPMG [LLP] audits to be reviewed." Compl. ¶ 126. But Plaintiffs do not specifically plead that any individual KPMG RICO Defendant ever had anything whatever to do with the audits of Credit Suisse, nor do they connect the "Steal the List" issue to any allegedly illegal conduct or misconduct in the performance of any audits of Credit Suisse.

Plaintiffs have pled only one specific predicate act that is directly linked to the KPMG RICO Defendants: "the KPMG [LLP] 'steal the list' escapade involving multiple criminal convictions." RCS, at 1; *see* Compl. ¶¶ 415–423. Plaintiffs characterize the Steal the List Scandal as an "action to advance the ongoing conspiracy by avoiding detection and exposure of defects in Credit Suisse audits, by destroying and altering work papers." RCS, at 9. Plaintiffs explain:

> Having stolen the list of KPMG [LLP] audits to be reviewed, KPMG [LLP] and its top New York partners learned Credit Suisse was on the list for review during 2014–2017. They then secretly and illegally altered the Credit Suisse audit workpapers to cover up deficiencies as to internal accounting/financial and regulatory/legal compliance controls and risk management procedures. This assured that the PCAOB would not discover the deficiencies or publicize KPMG [LLP]'s deficient Credit Suisse audits and its findings, which would have exposed the deficient audit and deficient risk management controls, which would have disrupted the ongoing misconduct/conspiracy, avoiding or ameliorating the damage to the common shareholders.

RCS, at 15–16. Though Plaintiffs claim that several of the KPMG Defendants – Bradley, Knopp, Newinski, Thomas, and Veihmeyer – "were each aware of the illicit 'steal the list' and 'cheat on the test' activities and of the destruction and alteration of the Credit Suisse audit workpapers to cover up deficiencies in the Credit Suisse audits," Compl. ¶¶ 124–25, the only KPMG Individual Defendants named as defendants on the RICO claims are the KPMG RICO Defendants – Holder,

Marcello, Middendorf, Sweet, Whittle, and Wada. RCS, at 16. According to Plaintiffs, "Their conduct was criminal, involving mail and wire fraud, for which several KPMG defendants were prosecuted and convicted in the Southern District of New York." Compl. ¶¶ 126–32.

In the Complaint, Plaintiffs quote from some of the Steal the List Scandal DOJ press releases and PCAOB announcements and indicate that the details of the mail and wire fraud charges can be found in said press releases and announcements, as well as in guilty pleas by some of the KPMG RICO Defendants and two opinions by the Hon. J. Paul Oetken. *Id.* ¶ 480. Plaintiffs' quotations from the press releases indicate that in connection with the Steal the List scandal: Holder, Middendorf, Whittle, and Wada were indicted with conspiracy and wire fraud charges in the Southern District of New York, *id.* ¶ 417; Holder, Sweet, and Whittle pled guilty to conspiracy and wire fraud charges, *id.*; Dkt. No. 125;[6] Middendorf and Wada were later convicted of wire fraud charges, Compl. ¶ 418; and Marcello was sanctioned and censured by the PCAOB for "supervisory failures in connection with KPMG [LLP]'s receipt and use of confidential PCAOB inspection information." *Id.* ¶ 419. Plaintiffs conclude that "Had this criminal conduct not occurred, the PCAOB would have discovered the defects and deficiencies of KPMG [LLP]'s audits of Credit Suisse — especially the internal financial/accounting, legal/regulatory and risk control procedures control deficiencies and then published the result of its review. When the PCAOB published these deficiencies, as it would have done in due course the ongoing scheme and conspiracy would have been disrupted, and damage to Credit Suisse common shareholders avoided." *Id.* ¶ 133.

The misconduct that occurred in the Steal the List Scandal is insufficient support for Plaintiffs' RICO claims against KPMG LLP and the KPMG RICO Defendants for two reasons:

---

[6]   Plaintiffs failed to categorize Sweet as one of the KPMG RICO Defendants in their Complaint, *id.* ¶ 436, but do so in their RICO Case Statement. RCS, at 15.

(1) Plaintiffs' allegations regarding the Steal the List Scandal lack the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure; and (2) as it turns out, the misconduct involved in the Steal the List Scandal is not considered to be a violation of the federal wire fraud statute. In other words, it is not conduct for which the KPMG RICO Defendants should have been criminally convicted or could be convicted today. In fact, the convictions of the KPMG RICO Defendants for their role in the Steal the List Scandal are being vacated.

Rule 9(b) states that "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity," and applies to allegations of mail or wire fraud alleged as predicate acts in a RICO complaint. *United States v. Int'l Longshoremen's Ass'n*, 518 F.Supp.2d 422, 479 (E.D.N.Y. 2007). It seems that Plaintiffs attempted to comply with Rule 9(b)'s particularity requirement by stating in the Complaint that the RICO predicate acts, including the Steal the List scandal, "are detailed in the indictments, pleas, pleadings, statements, non-prosecution agreements and press releases issued in connection with those proceedings" and that "this misconduct as specified in the documents . . . is incorporated by reference." Compl. ¶ 449. But that won't do at all. In *United States v. Int'l Longshoremen's Ass'n*, the plaintiffs "attempt[ed] to plead many essential elements of the alleged RICO claims by 'incorporating' hundreds of pages of prior pleadings, with no guidance as to which specific allegations [we]re intended to be deemed incorporated;" this ran afoul of the notice requirements of Rule 8(a). 518 F.Supp.2d at 464; *DLJ Mortg. Cap., Inc. v. Kontogiannis*, 726 F.Supp.2d 225, 234 (E.D.N.Y. 2010). Plaintiffs in the instant action did not even bother to provide the Court with the actual "indictments, pleas, pleadings, statements, non-prosecution agreements, and press releases" Compl. ¶ 449, that they are incorporating by reference. Plaintiffs also have not provided citations – aside from various

quotations from press releases – to any parts of the documents "incorporated by reference" that detail the wire fraud allegations with any semblance of particularity.

Plaintiffs have also failed to plead any non-conclusory facts or make references to specific portions of documents in support of their claim that the Steal the List Scandal involved mail fraud. Plaintiffs "effort to plead essential elements of the causes of action alleged in the Amended Complaint by incorporating allegations from several prior civil and criminal actions" fails to meet Rule 9(b)'s pleading standard. *Int'l Longshoremen's Ass'n*, 518 F.Supp.2d 422, 464 (E.D.N.Y. 2007).

But there is a far more fundamental reason why Plaintiffs' reliance on the Steal the List Scandal as a RICO predicate act is flawed. The misconduct involved turns out not to be a crime.

First, Plaintiffs have not pled that KPMG LLP's conduct in connection with the Steal the List Scandal was criminal or indictable; instead, Plaintiffs merely state that KPMG LLP was severely sanctioned by the PCAOB and the SEC and required to pay an over $50 million fine. Compl. ¶¶ 5, 414. In addition, Plaintiffs' pleadings with respect to Marcello, one of the individual KPMG RICO Defendants, confirm that he did not face any criminal consequences; rather, he was only sanctioned by the PCAOB, which is in no way a criminal enforcement agency. *Id.* ¶ 419.

But of course, one need not be convicted for an act to qualify as a predicate act; one need only be susceptible of conviction. And here is where the Complaint is fatally deficient as against the KPMG RICO Defendants. As the KPMG RICO Defendants state in their reply papers: "Plaintiff[s] do[] not refute that [their] claims of wire and mail fraud – the only predicate acts alleged against the Former KPMG Employees – rely entirely on criminal prosecutions that the government has now conceded were improper as a matter of law." In late 2022, the Second Circuit clarified, in *United States v. Blaszczak*, 56 F.4th 230, 243–44 (2d Cir. 2022), that "intangible

regulatory information is not 'property' within the meaning of 18 U.S.C. § 1343 and therefore cannot form the basis of a wire fraud conviction." *United States v. Britt*, No. 18-cr-0036, 2024 WL 168333, at *1 (S.D.N.Y. Jan. 16, 2024). The *Blaszczak* defendants had "schemed to obtain and promptly utilize advance information as to how the regulatory power would be exercised by [the Centers or Medicare & Medicaid Services]," a federal agency within the United States Department of Health and Human Services. 56 F.4th at 233, 244. Since the Supreme Court previously held that the government's right to determine who should get a benefit does not create a property interest, *id.* at 244 (citing *Kelly v. United States*, 140 S.Ct. 1565, 1572 (2020); *Cleveland v. United States*, 531 U.S. 12, 23 (2000)), the Second Circuit found that "The information reflecting such a decision and the timing of that disclosure are regulatory in character and do not constitute money or property of the victim . . . ." *Blaszczak*, 56 F.4th at 244.

In light of *Blaszczak*, the Government conceded in its Motion for Remand to dismiss Middendorf and Wada's counts of conviction that their convictions should be set aside, as "the evidence at trial was insufficient to establish that the confidential information at issue in [the Steal the List Scandal] constituted 'property' under *Kelly* and *Blaszczak* [] because it had value only in the 'exercise of regulatory power,' and not in the government's 'role 'as property holder.'''" Ex. 1 to Axelrod Decl., at 6–7. On December 5, 2023, the Second Circuit granted the Government's motion and remanded Middendorf and Wada's appeals, Ex. A. to Dkt. No. 124, and soon after, the Hon. J. Paul Oetken entered orders of *nolle prosequi* with respect to Middendorf and Wada. Exs. B and C. to Dkt. No. 125. In the KPMG RICO Defendants' (aside from Wada) Motion to Dismiss, they claim that "As the government's wire fraud theory was legally insufficient, it is likely the convictions of the Former KPMG Employees who pled guilty will also be dismissed." I agree that that is likely.

36

Plaintiffs reject the KPMG RICO Defendants' argument on this point, and claim in their opposition papers, filed before the December 2023 developments in Middendorf and Wada's cases, that, "The recent remand of the Middendorf appeal is of no moment in light of the substantial allegations of the predicate acts."

This claim is baseless, since the "substantial allegations" involving the Steal the List Scandal are based almost entirely on the criminal convictions of the various KPMG RICO Defendants. The fact that only two of the KPMG RICO Defendants' Steal the List Scandal convictions have been overturned to date is irrelevant. The Second Circuit has held that an essential element of wire fraud – property – is not implicated by the Steal the List Scandal. *See Blaszczak*, 56 F.4th at 244. The result of this ruling, based on a Supreme Court case that overturned two decades of Second Circuit precedent, *see Kelly*, 140 S.Ct. at 1572, has been the vacatur of numerous convictions alleging violations of the wire fraud statute in many cases, including the KPMG LLP cases. The ruling means that the allegations arising out of the Steal the List Scandal cannot be the basis for a criminal conviction, and to the extent they were, the convictions are subject to vacatur. That ruling binds this court.

Therefore, none of the allegations against the KPMG RICO Defendants involves criminal conduct in connection with the Steal the List Scandal. Since Plaintiffs do not identify any other specific predicate acts of mail or wire fraud in which the KPMG RICO Defendants allegedly engaged, they have failed to plead that KPMG LLP or the KPMG RICO Defendants engaged in any acts of racketeering activity.

### d. The PSLRA Bars the Plaintiffs' "RICO" Claim for the Diminution in the Value of their Investment

Section 107 of the Private Securities Litigation Reform Act ("PSLRA"), known as the "RICO Amendment," provides that: "no person may rely upon any conduct that would have been

actionable as fraud in the purchase or sale of securities to establish a violation of section 1962."
18 U.S.C. § 1964(c). The RICO Amendment "was intended not simply 'to eliminate securities
fraud as a predicate offense in a civil RICO action,' but also to prevent a plaintiff from 'plead[ing]
other specified offenses, such as mail or wire fraud, as predicate acts under civil RICO if such
offenses are based on conduct that would have been actionable as securities fraud.'" *Monterey Bay
Mil. Hous., LLC v. Ambac Assurance Corp.*, 2021 WL 1226984, at *27 (S.D.N.Y. Mar. 31, 2021)
(citations omitted). This bar (the "PSLRA Bar") was designed to "eliminate the possibility that
litigants might frame their securities claims under a mail or wire fraud claim," *Jordan (Bermuda)
Inv. v. Hunter Green Inv.*, 205 F.Supp.2d 243, 248 (S.D.N.Y. 2002) (citations omitted),
"eliminat[e] the so-called 'treble damage blunderbuss of RICO' in securities fraud cases,"
*Mathews v. Kidder, Peabody & Co.*, 161 F.3d 156, 164 (3d Cir. 1998), and prevent "litigants from
using artful pleading to boot-strap securities fraud cases into RICO cases." *MLSMK Inv. v. JP
Morgan Chase & Co.*, 651 F.3d 268, 274 (2d Cir. 2011) (internal citation omitted); *Thomas H. Lee
Equity Fund V, L.P. v. Mayer Brown, Rowe & Maw LLP*, 612 F.Supp.2d 267, 281 (S.D.N.Y. 2009).

     Courts consult Section 10(b) of the Securities Exchange Act of 1934 for guidance on what
conduct is actionable as securities fraud for purposes of the RICO Amendment. *See Zohar CDO
2003-1, Ltd. v. Patriarch Partners, LLC*, 286 F. Supp. 3d 634, 644 (S.D.N.Y. 2017). Under Section
10(b), the determination of whether conduct is actionable as securities fraud focuses on whether
the fraudulent conduct is "in connection with the purchase or sale of any security." 15 U.S.C. §
78j(b); *see Levinson v. PSCC Servs., Inc.*, No. 3:09-cv-00269, 2009 WL 5184363, at *6 (D. Conn.
Dec. 23, 2009). "The Supreme Court has defined the scope of 'in connection with' very broadly
to encompass a 'fraudulent scheme in which the securities transactions and breaches of fiduciary
duty coincide.'" *Levinson*, 2009 WL 5184363, at *6 (quoting *S.E.C. v. Zandford*, 535 U.S. 813,

825, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002)). "'In general, the 'in connection with' element is met when the fraud alleged is that the plaintiff bought or sold a security in reliance on misrepresentations as to its value.'" *Stechler v. Sidley, Austin Brown & Wood, LLP*, 382 F.Supp.2d 580, 594 (S.D.N.Y. 2005) (quoting *Araujo v. John Hancock Life Ins.*, 206 F.Supp.2d 377, 383 (E.D.N.Y. 2002)).

"In determining whether misrepresentations coincided with the purchase or sale of securities, courts consider the allegedly fraudulent scheme as a whole." *Levinson*, 2009 WL 5184363, at *7; *see Stechler*, 382 F.Supp.2d at 597–98. If even "one predicate act alleges breaches of duty coincident with securities transactions then the whole scheme is subject to the [RICO Amendment]." *Ling v. Deutsche Bank*, No. 04 cv 4566, 2005 WL 1244689, at *4 (S.D.N.Y. May 26, 2005). In other words, "when any predicate act is barred by the PSLRA it is fatal to the entire RICO claim." *Zanghi v. Ritella*, 19 Civ. 5830 (NRB), 2021 WL 4392756, at *16 (S.D.N.Y. Sept. 24, 2021) (citations omitted).

The Credit Suisse Defendants have argued that Plaintiffs' RICO claims are barred by the RICO Amendment because, "The Complaint, at its core, alleges securities fraud," making Plaintiffs' case the type of "'securities-fraud-lawsuit-in-disguise' that the PSLRA was intended to prevent." The Court agrees that the PSLRA precludes Plaintiffs from asserting their RICO claims against the Credit Suisse Defendants.

Plaintiffs, for their part, attempt to avoid the PSLRA bar in their pleadings by claiming that, "This action is not based on fraud or false or misleading statements by the Credit Suisse Defendants or KPMG Defendants in connection with the purchase or sale of securities, but rather on their conduct including breaches of their statutory duties and acts of mismanagement. The claims are for holders, not purchasers, of Credit Suisse common shares who suffered damages or

losses due to the negligence of the Credit Suisse Defendants and the KPMG Defendants, by continuing to hold or upon disposing of those securities." Compl. ¶ 150.

Conversely, the Credit Suisse Defendants argue that Plaintiffs' substantive RICO claim "necessarily alleges, involves, or rests on the purchase or sale of securities because (i) most if not all of the putative class members would not even be members if they had not *purchased* securities; and (ii) Plaintiff[s] concede[] that [their] claims *do* allege, involve, or rest on the *sale* of securities." (emphasis in original).

We start from the proposition that Plaintiffs' class consists of Credit Suisse stockholders. Plaintiffs' proposed class consists of, "All persons who held Credit Suisse common stock, including ordinary shares and ADSs, between October 22, 2013 and March 17, 2023, and suffered loss/damage due to Defendants' actionable conduct, *by continuing to hold or disposing of their shares.*" Compl. ¶ 202 (emphasis added). By identifying possible members of the Class as individuals who "dispos[ed] of their shares" within the alleged Class Period, Plaintiffs' own pleading encompasses the "sale of securities" portion of the RICO Amendment.

Similarly, the Complaint is replete with allegations that sound in securities fraud. Plaintiffs claim that the KPMG Defendants allegedly helped keep Credit Suisse's secrets by improperly certifying Credit Suisse's financial statements, *id.* ¶¶ 7, 411, and allege at the outset of their complaints (*id.* ¶ 5) that if the inadequate corporate controls and risk management procedures had been "discovered and made public...their discovery would have disrupted the ongoing conspiracy and ameliorated the damage to be suffered by the Credit Suisse shareholders." In other words, if the Plaintiffs had been aware of how badly managed Credit Suisse was, they could have "ameliorated the[ir] damage" in the only way it was possible to ameliorate such damage – by

selling their stock. That, of course, is the type of damages available to Plaintiffs in securities fraud lawsuits. *See Aticon AG v. China Ne. Petroleum Holdings Ltd.*, 692 F.3d 34, 38 (2d Cir. 2012).

Of course, the Complaint also tosses around various non-specific assertions of wire fraud and mail fraud – not to mention bank fraud (18 U.S.C. § 1344); visa fraud (18 U.S.C. § 1546); and money laundering (18 U.S.C. §§ 1956–57) – as predicate acts on which the purported RICO claims rest. Compl. ¶ 439. According to Plaintiffs, allegedly, the Credit Suisse Defendants violated the aforementioned statutes in a variety of ways: by engaging in illegal conduct, including acts of mail and wire fraud, in connection with the sale of mortgage-backed "toxic" securities; by assisting customers engaged in tax avoidance, which somehow involved getting Credit Suisse officials into New York/the United States in violation of visa, passport, and immigration laws; by committing repeated unspecified acts of mail and wire fraud (no dates or fraudulent representations specified); by laundering money through transfers intended to assist with illegal activity, including the avoidance of anti-terrorist sanctions and the aforementioned tax avoidance schemes; by violating the Foreign Corrupt Practices Act in connection with the so-called "Princelings" payoff scandal, which allegedly involved unspecified acts of mail and wire fraud; through their involvement in the Tuna Boats/Bonds scandal, again involving unspecified acts of mail and wire fraud; through their conduct related to residential mortgage backed securities, which included unspecified acts of mail and wire fraud; and finally by engaging in illegal FOREX trading, which involved financial institution, mail, and wire fraud. *Id.* ¶ 438. Some of the alleged predicate acts resulted in criminal prosecutions in the United States, and specifically, in New York federal courts. *See id.* ¶¶ 20, 64, 67, 69, 394, 438, 466.

To the extent that these alleged statutory violations are interwoven with claims relating to securities fraud – and while the prolix pleading is anything but specific in this regard, most of

them indubitably are – they fall squarely within the PSLRA's bar against using RICO to engage in artful pleading around the fact that violations of securities laws cannot be used to undergird a civil RICO claim. *See MLSMK*, 651 F.3d at 274.

A clear example of this is the "toxic" mortgage-backed securities scandal ("RMBS Scandal") that Plaintiffs have identified as one of the RICO predicate acts, as it allegedly involved mail and wire fraud. Compl. ¶ 438. In connection with the RMBS Scandal, Plaintiffs state that: Credit Suisse officials "misrepresented delinquency data," "kept investors in the dark," "deprived investors of essential information" "created fictional profits," "made false and misleading representations to prospective investors about the characteristics of the mortgage loans it securitized." *See id.* ¶¶ 20, 49, 248, 254, 298, 438(e). The alleged misconduct that Plaintiffs have described is considered securities fraud.

Moreover, Plaintiffs fail to mention in their pleadings is that Credit Suisse entities (Credit Suisse Group, Credit Suisse Securities (USA) LLC) have already been sued – in this District and elsewhere – for conduct related to the RMBS Scandal in 2008 and 2009; the claims in those actions centered on violations of the Securities Exchange Act of 1934 and the Securities Act of 1933. Dkt. No. 127; *see Freidus v. ING Groep N.V.*, Case No. 1:09-cv-01049-LAK (S.D.N.Y.); *In re IndyMac Mortg.-Backed Sec. Litig.*, Case No. 1:09-cv-04583-LAK (S.D.N.Y.); *Cornwell v. Credit Suisse Grp.*, Case No. 1:08-cv-03758-VM-JCF (S.D.N.Y.); *New Jersey Carpenters Health Fund v. DLJ Mortg. Cap., Inc.*, Case No. 1:08-cv-05653-PAC (S.D.N.Y.); *Tsereteli v. Residential Asset Securitization Tr. 2006-A8*, Case No. 1:08-cv-10637-FM (S.D.N.Y.); *Genesee Cnty. Emp. Ret. Sys. v. Thornburg Mortg. Inc.*, Case No. 1:09-cv-00300- JB-KBM (D.N.M.). To illustrate, the Credit Suisse Defendants have recounted that in *Cornwell v. Credit Suisse Grp.*, Case No. 1:08-cv-03758-VM-JCF, "Plaintiffs brought suit under the Securities Exchange Act of 1934, alleging

that Credit Suisse Group had made material misstatements or omissions in certain of its public disclosures concerning its exposure to securities such as RMBS and CDOs backed by sub-prime debt and concerning the sophistication and adequacy of its risk management processes and models." Dkt. No. 127. In other words, the *Cornwell* plaintiffs sued Credit Suisse and several of its officers and directors for securities fraud. That case was settled in mid-2011, and the settlement class included "all purchasers of Credit Suisse Group American Depositary Shares on the New York Stock Exchange during the period between February 15, 2007 and April 14, 2008," among others, *id.*, meaning that Credit Suisse ADs holders who lost money by holding or disposing of their shares because of RMBS during that class period have already been compensated.

Of course, the *Cornwell* class period predates the commencement of the proposed RICO Class Period in the instant action, which dates from ten years prior the commencement of this lawsuit, or May 2013. But Plaintiffs do not distinguish between the alleged misconduct that occurred prior to the Class Period and during the Class Period in the discussion of the RMBS Scandal in their pleading. Rather, Plaintiffs state that "The damage/losses suffered by Credit Suisse's shareholders over past years . . . originated with the 2007– 2008 subprime toxic loan scandal in Credit Suisse's Investment Banking operations," Compl. ¶ 388, and describe the RMBS Scandal as "the still unfolding toxic securities scandal dating back to 2008–2009," *id.* ¶ 20, "a situation that had even then [2007–2008] long existed inside Credit Suisse, was never fixed, and continued through March 17, 2023." *Id.* ¶ 25.

"The RICO Amendment aimed to avoid duplicative recoveries for securities fraud violations." *D'Addario v. D'Addario*, 75 F.4th 86, 93 (2d Cir. 2023). Securities laws generally provide adequate remedies for those injured by securities fraud. S. Rep. 104–98, at 19, 1995 U.S.C.C.A.N. at 698. Other plaintiffs are pursuing recovery for securities fraud that was committed

within the statute of limitations – on behalf of at least some members of this very class, and in this very court. *See Turner v. Credit Suisse Grp. AG*, No. 1:23-cv-5874. The complaints in the Credit Suisse securities fraud cases currently pending in this court all allege that the Credit Suisse Defendants failed to disclose weaknesses in CS's internal controls and made misrepresentations in the company's financials. Recovery for their losses in connection with a RICO scheme there would be purely duplicative. The fact that the RICO "Class Period" extends back beyond the class periods alleged in the pending securities fraud classes is of no moment, because RICO cannot be used as a vehicle to recover for otherwise time-barred losses in the value of securities. And the fact that RICO provides for treble damages while the securities laws do not is also of no moment; Congress was well aware of that fact when it passed the RICO Amendment to the PSLRA. So no harm, no foul.

But, says Plaintiffs, "No securities-fraud claims are available to holders and also to the many Class Members who held Credit Suisse's common shares, which are traded outside the US." However, this is precisely how the RICO Amendment operates: it "bars a plaintiff from asserting a civil RICO claim premised upon predicate acts of securities fraud, including mail or wire fraud, even where the plaintiff could not bring a private securities law claim against the same defendant." *MLSMK*, 651 F.3d at 277. Again, Congress specifically concluded that it would not allow RICO to be used – or misused – in situations that are more properly governed by securities laws, regardless of who does or does not have access to redress under those laws.

So to the extent the schemes alleged in the Complaint rely on RICO predicate acts that are premised on what are essentially securities law violations – even if they are also based on other purported violations of law – Plaintiffs cannot rely on them to undergird their RICO claims.

Of course, acts of mismanagement that do not somehow implicate securities fraud and that violate certain federal statutes could serve as predicate acts for RICO claims. However, that simply brings us full circle to the original reason why the RICO claims fail. By identifying their damages as the value of investment losses, claims that mismanagement – however it is carried out (including by the violation of a statute that qualifies as a RICO predicate act) – caused the value of someone's investment to decline cannot be redressed in a civil RICO action. Those claims belong to the corporation, not its stockholders (save for two discrete exceptions, neither of which is applicable here (*see supra* pp. 20–23)). *See Manson*, 11 F.3d at 1131. "Harms that are derivative – in that the injurious act merely causes a diminution in the value of a shareholders' stock – do not meet the proximate cause standard for standing required under RICO." *Palatkevich v. Choupak*, 152 F.Supp.3d 201, 215 (S.D.N.Y. 2016).

The fact that the only injury Plaintiffs allege is the diminution of the value of their securities is really the end of the story. Plaintiffs' argument that their claims are not securities fraud claims because they are based on Defendants' "breaches of their statutory duties and acts of mismanagement" fails because corporate mismanagement in violation of Swiss law is not a RICO predicate act. And again, Plaintiffs' RICO claims based on "breaches of their statutory duties and acts of mismanagement" belong to the corporation, not to its stockholders. *See Manson*, 11 F.3d at 1131. These Plaintiffs lack standing to bring them.

### e.  Plaintiffs' RICO Conspiracy Claim Necessarily Fails

The Court concludes that: (1) Plaintiffs lack standing to bring their substantive RICO claim against the Credit Suisse Defendants; (2) Plaintiffs have not plausibly alleged a RICO enterprise; (3) Plaintiffs have not adequately alleged that KPMG LLP and the KPMG RICO Defendants were involved in any acts of racketeering activity; and (4) Plaintiffs' substantive RICO claim against

45

the Credit Suisse Defendants is barred by the PSLRA's RICO Amendment. It is not necessary to address the remaining arguments in support of dismissal of Plaintiffs' RICO claims.

The second cause of action must be dismissed against the RICO Defendants. So must the third cause of action; without a predicate substantive RICO claim, Plaintiffs' RICO conspiracy claim necessarily fails. *See One World, LLC*, 2021 WL 184400, at *11 (citations omitted); *Maersk, Inc. v. Neewra, Inc.*, 687 F.Supp.2d 300, 336 (S.D.N.Y. 2009); *Int'l Broth. of Teamsters*, 163 F.Supp.2d at 285.

### III.    Plaintiffs' Swiss Law Claim Is Conditionally Dismissed on the Basis of *Forum Non Conveniens*

The only claim that remains following dismissal of the RICO claims is Plaintiffs' claim arising under Swiss law, alleging the mismanagement of Credit Suisse and breaches of various statutory duties. In Count I of the Complaint, which is brought against all Defendants, Plaintiffs allege violations of Articles 41, 42, 50, 55, 716(a), 717, 754, 755, and 759 of the Swiss Code of Obligations, which regulates Swiss companies. Compl. ¶ 431.

Article 716(a) lists a Board of Directors' non-transferable and inalienable duties under Swiss Law, including: the "overall management of the company and the issuing of all necessary directives;" the organization of "the accounting, financial control and financial planning systems as required for management of the company;" the appointment and dismissal of "persons entrusted with managing and representing the company;" and the "overall supervision of the persons entrusted with managing the company, in particular with regard to compliance with the law, articles of association, operational regulations, and directives." Article 717, titled "Duty of Care and Loyalty," provides that: "the members of the board of directors and third parties

engaged in managing the company's business must perform their duties with all due diligence and safeguard the interests of the company in good faith."

Articles 41, 50, and 55 outline individual, joint and several, and employer liability under Swiss tort law. Article 759 also provides for joint and several liability. Article 754 explains liability for members of the Board of Directors and all persons engaged in business management of the company; they "are liable both to the company and to the individual shareholders and creditors for any losses or damage arising from any intentional or negligent breach of their duties." Article 755 extends this liability to external auditors. Article 42 is instructive on how to determine damages.

Plaintiffs assert that the Credit Suisse Defendants and KPMG Defendants, acting individually and jointly, and as instigators, perpetrators, accomplices, assistors, and abettors in a civil conspiracy, participated in the mismanagement of Credit Suisse and breached the duties they owed Credit Suisse's shareholders under Swiss law. Compl. ¶ 430. Plaintiffs claim that "Credit Suisse shareholders have both been damaged and suffered losses due to the Credit Suisse Defendants and KPMG Defendants' negligence and failures to comply, or enforce compliance, with Credit Suisse's Code of Conduct, and breaches of their duties of due care, diligence, prudence, and loyalty. Their actions and failures to act were substantial factors in causing the damages and losses alleged." *Id.* ¶ 432. The damages sought are, predictably, the value of the Plaintiffs' investment losses.

Virtually identical claims were pleaded in an action brought in the Commercial Division of the New York State Supreme Court by a different member of the purported class, Ezra Cattan. Cattan brought a shareholder derivative action against many of the same Credit Suisse individual

and entity defendants who are parties to the instant action. No Swiss law claims were brought against KPMG LLP or anyone affiliated with it in the *Cattan* lawsuit.

The *Cattan* claims were dismissed by The Hon. Andrea Masley on *forum non conveniens* grounds. *Cattan v. Rohner*, 2023 N.Y. Slip Op. 31213, 2023 WL 2868337 (N.Y. Sup. Ct. Apr. 10, 2023). Justice Masley, after considering many of the same arguments made by the parties here, concluded that Switzerland was the most appropriate forum for adjudicating the Swiss law claim against Credit Suisse and its officers and directors, since "the number and weight of the relevant factors in this action center in Switzerland and not in New York." *Cattan*, 2023 WL 2868337, at *3.

I do not sit as a court of appeal over Justice Masley, but I believe her decision was correct. For the reasons she articulated, which are discussed yet again below, Count I as against the Credit Suisse Defendants is conditionally dismissed on the basis of *forum non conveniens* because it is a claim that should be litigated in Switzerland, where Credit Suisse was incorporated and whose laws governed the bank's internal corporate affairs.[7]

Justice Masley did not have occasion to address whether claims asserted under Swiss law against KPMG LLP or the KPMG Individual Defendants should be dismissed on the ground of *forum non conveniens* – but this court does, because Plaintiffs have added KPMG-related parties. For the reasons stated below, I conclude that the Swiss law claim as against KPMG LLP and the

---

[7]     The Court cannot decide this case on *res judicata* grounds. "Under the doctrine of *res judicata*, or claim preclusion, 'A final judgment on the merits of an action precludes the parties or their privies from re-litigating issues that were or could have been raised in that action.' " *EDP Med. Comput. Sys., Inc. v. United States*, 480 F.3d 621, 624 (2d Cir.2007) (quoting *St. Pierre v. Dyer*, 208 F.3d 394, 399 (2d Cir. 2000)) (other citations and quotations omitted). Thus, the doctrine bars "later litigation if [an] earlier decision was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause of action." *Id.* (quoting *In re Teltronics Servs., Inc.*, 762 F.2d 185, 190 (2d Cir. 1985)). *Cattan*, however, was not a final judgment on the merits – the Supreme Court has concluded that *forum non conveniens* dismissal is a non-merits decision, as "it is a determination that the merits should be adjudicated elsewhere." *Sinochem Intern. Co. v. Malay. Intern. Shipping Corp.*, 549 U.S. 422, 432 (2007). Nonetheless, Justice Masley's decision is not without precedential value.

KPMG Individual Defendants should also be conditionally dismissed on the basis of *forum non conveniens*.

### a. The Law of *Forum Non Conveniens*

The *forum non conveniens* doctrine permits a court, in certain instances, to dismiss a claim even if the court is a permissible venue with proper jurisdiction over the claim. *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 100 (2d Cir. 2000) (citation and internal quotation marks omitted). "The central purpose of a *forum non conveniens* inquiry is to determine where trial will be most convenient and will serve the ends of justice." *R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164, 167 (2d Cir. 1991).

Courts in this Circuit engage in a three-step process to determine whether *forum non conveniens* dismissal is appropriate. *See Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 154 (2d Cir. 2005). The first step requires the Court to determine the degree of deference to be afforded to the plaintiff's choice of forum. *Id.* at 153–54. Next, the Court examines whether an adequate alternative forum exists. *In re Alcon S'holder Litig.*, 719 F.Supp.2d 263, 269 (S.D.N.Y. 2010) (citations omitted). Finally, the Court must balance the private and public interest factors enumerated by the Supreme Court in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947) that are implicated in the choice of forum. *Olin Holdings Ltd. v. Libya*, 73 F.4th 92, 109 (2d Cir. 2023); *Wiwa*, 226 F.3d at 100; *Norex*, 416 F.3d at 153. The defendant has the burden of establishing that an adequate alternative forum exists, and then showing that the balance of private and public interest of pertinent factors tilts heavily in favor of the alternative forum. *Olin Holdings Ltd.*, 73 F.4th at 109; *Wiwa*, 226 F.3d at 100.

In certain circumstances, a court may conditionally grant a motion to dismiss on *forum non conveniens* grounds – even if the defendant is not entirely successful in meeting its burden –

as long as it can protect the interests of the plaintiff by making that dismissal conditional. *Bank of Credit & Com. Int'l (Overseas) Ltd. v. State Bank of Pak.*, 273 F.3d 241, 247–48 (2d Cir. 2001); *see Do Rosario Veiga v. World Meteorological Org.*, 486 F.Supp.2d 297, 305 (S.D.N.Y. 2007). But the possibility of conditional dismissal does not "excuse the district court from engaging in a full analysis of those issues of foreign law or practice that are relevant to its decision, or from closely examining all submissions related to the adequacy of the foreign forum." *Bank of Credit & Com. Int'l (Overseas) Ltd.*, 273 F.3d at 248.

The Credit Suisse Defendants urge this court to dismiss Plaintiffs' Swiss law claim on the basis of *forum non conveniens* because Plaintiffs' choice of forum should be given no deference, Switzerland offers an adequate forum to adjudicate claims of corporate mismanagement under Swiss law, and the *Gilbert* factors favor Switzerland. KPMG LLP and the KPMG Individual Defendants join in the Credit Suisse Defendants' Motion to Dismiss.

Because the First Cause of Action arises entirely under Swiss law and I am convinced that a Swiss court not only would and could, but must, agree to hear it, the motion to dismiss on *forum non conveniens* grounds should be granted. But because it is not clear that all of the numerous defendants sued in this case are amenable to personal jurisdiction in Switzerland, dismissal will be conditioned on their agreeing to be sued in Switzerland – a common form of relief that protects the plaintiffs from prejudice.

### (1) Deference to Plaintiffs' Choice of Forum

While "generally, there is a strong presumption in favor of the plaintiff's choice of forum," *Do Rosario Veiga*, 486 F.Supp.2d at 303 (citations omitted), "the degree of deference to be given to a plaintiff's choice of forum moves on a sliding scale depending on several relevant considerations," *Iragorri v. United Tech. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001):

> Factors to be considered include: "the convenience of the plaintiff's residence in relation to the chosen forum, the availability of witnesses or evidence to the forum district, the defendant's amenability to suit in the forum district, the availability of appropriate legal assistance, and other reasons relating to convenience or expense." On the other side of the equation, circumstances "generally indicative of forum shopping," *see Norex*, 416 F.3d at 155, include "attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, the habitual generosity of juries in the United States or in the forum district, the plaintiff's popularity or the defendant's unpopularity in the region, or the inconvenience and expense to the defendant resulting from litigation in that forum."

*Maersk, Inc. v. Neewra, Inc.*, 554 F.Supp.2d 424, 451 (S.D.N.Y. 2008) (citing *Iragorri*, 274 F.3d at 72). Though "a district court is not required to consider every single factor specifically in making this determination," *Cortec Corp. v. Erste Bank Ber Oesterreichischen Sparkassen AG (Erste Bank)*, 535 F.Supp.2d 403, 408 (S.D.N.Y. 2008) (citing *Norex*, 416 F.3d at 155), under the sliding scale, "the greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for *forum non conveniens*." *Iragorri*, 274 F.3d at 71.

"However, where the circumstances indicate that the parties and material events bear no bona fide connection to the United States, or that in relation to the core operative facts in dispute the parties and events at best have only marginal links to the plaintiff's chosen venue, that choice of forum is not entitled to special deference. . . ." *Do Rosario Veiga*, 487 F.Supp.2d at 302. In other words, "where the plaintiff's choice is determined to stem more from concerns of convenience, it is entitled to greater deference; where the choice indicates forum-shopping, it is entitled to less deference." *Maersk, Inc.*, 554 F.Supp.2d at 452.

Here, the relevant factors indicate that Plaintiffs' choice of the Southern District of New York as its forum is not entitled to substantial deference. *See Cortec Corp.*, 535 F.Supp.2d at 408.

Plaintiff Gregory A. Stevenson is a U.S. citizen domiciled in Indiana, Compl. ¶ 79, and is not a resident of this District. Plaintiff Nicole Lawtone-Bowles is a U.S. citizen domiciled in New York. Opp. Memo, at 6. The fact that Stevenson is domiciled outside of New York does not mean that Plaintiffs' choice of forum is entitled to less deference – "It is not a correct understanding of the rule to accord deference only when the suit is brought in the plaintiff's home district;" "Rather, the court must consider a plaintiff's likely motivations in light of all the relevant indications." *Iragorri*, 274 F.3d at 73.

Plaintiffs are suing in a representative capacity – they brought their lawsuits, asserting direct claims, on behalf of a Class of Credit Suisse common shareholders. Compl. ¶¶ 1–2. But class action status is merely one factor that may be taken into consideration in the determination of convenience. *See Celestin v. Martelly*, No. 18-cv-7340, 2023 WL 6385339, at *5 (E.D.N.Y. Sept. 29, 2023).

Plaintiffs state that their choice of this District as the forum for their lawsuits was driven by considerations of convenience and cost. They assert – incorrectly – that New York is the "only forum in the world where the claims asserted can actually be litigated by their contingent-fee lawyers who will fund the prosecution of the case on a class basis against all the named Defendants in a jury trial with live witnesses." Opp. Memo, at 51; *see* Compl. ¶¶ 178, 190–95. There are, of course, many fine lawyers all over the United States who are capable of bringing, funding and litigating class actions, and who do so in courts throughout the country. So this purported justification for suing in the Southern District of New York is utter nonsense.

Plaintiffs also claim that there is an overwhelming factual nexus between New York and the parties, claims, and underlying wrongdoing, asserting that Credit Suisse's U.S. operations were run out of New York. *See* Compl. ¶¶ 30, 151, 153, 157, 161, 163. I concede that this court probably has the greatest factual nexus to the claims in suit of any district court in the United States. But the fact that the Southern District of New York has a greater factual nexus to the allegations in this case than, say, the Southern District of Texas or Florida does not mean Plaintiffs' decision to sue here, as opposed to Switzerland, is entitled to great respect. The core operative facts relevant to Plaintiffs' Swiss law claim arise from the management and governance of Credit Suisse in Switzerland and under Swiss law. *See Cattan*, 2023 WL 2868337, at *5. Plaintiffs' Swiss law claim "involve[s] not an ordinary commercial dispute between two parties to a transaction, but matters of corporate governance that implicate the legal interests of countless third-party shareholders *around the world*, not just those litigants now before the Court." *In re Alcon*, 719 F.Supp.2d at 268 (emphasis added).

Plaintiffs have alleged that Defendants, acting individually and jointly, participated in the mismanagement of Credit Suisse, a Swiss stock corporation registered under Swiss law pursuant to the Swiss Code of Obligations. Compl. ¶¶ 80, 430; Belzer Decl. ¶ 3. No doubt in an effort to center this lawsuit in the United States, Plaintiffs name, as entity Defendants, only New York-based Credit Suisse subsidiaries and the New York-headquartered KPMG LLP. Compl. ¶ 1. But the Swiss law claim, as Justice Masley found, centers "on the individual defendants' alleged failure to adequately oversee [Credit Suisse's] operations." *Cattan*, 2023 WL 2868337, at *4 (citation omitted). Indeed, "[e]very significant aspect of this case – which is based on board-level and executive level decisions of a Swiss corporation – boils down to Switzerland: . . . the location of the alleged wrongdoing, the applicable law, and the majority of witnesses and

documents." *Id.* at *8 (citation omitted). To the extent that any of the named Credit Suisse U.S.

Entity Defendants is alleged to have been involved in the wrongdoing discussed in the pleading,

those allegations relate only to Credit Suisse Securities (USA) LLC (Compl. ¶¶ 256, 260, 281–

82, 305, 310, 313 450) – a fact that reinforces the Court's earlier conclusion that, at its core, this

is a securities fraud case. Significantly, two of the four Credit Suisse U.S. Entity Defendants –

Credit Suisse Capital LLC and Credit Suisse Management LLC – are mentioned only in the

caption and in the list of parties in the Complaint, but no wrongdoing whatsoever is alleged

against either of them. *Id.* ¶ 83. To the extent that Plaintiffs are alleging that Swiss law was

violated by deficient auditing on the part of "KPMG," documents cited within the Complaint

reveal that the U.S. entity Plaintiffs are suing – KPMG LLP – was never Credit Suisse's statutory

auditor. *See supra* pp. 31. So efforts to link the violations of Swiss law alleged in the First Cause

of Action to New York via wholly conclusory and unsupported allegations about KPMG LLP

and its employees fail.[8]

The fact that this case is the heir apparent to the now-dismissed *Cattan* case strongly

supports an inference of forum-shopping. In their motion to dismiss, the Credit Suisse

Defendants assert that: following Justice Masley's dismissal of the state court action, "Plaintiff's

counsel brought essentially the same claim, but with a new named plaintiff and a new theory of

direct (instead of derivative) standing. Much of the Complaint itself, however, is not new at all:

more than 100 paragraphs are taken verbatim or nearly verbatim from the *Cattan* complaint, both

cases challenge conduct spanning more than a decade, both cases assert violations of the same

---

[8]    *See Marte v. Montefiore Med. Ctr.*, No. 22-cv-03491, 2022 WL 7059182, at *4 (S.D.N.Y. Oct. 12, 2022); *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F.Supp.3d 111, 159 (S.D.N.Y. 2021); *Shanghai Weiyi Intern. Trade Co. v. Focus 2000 Corp.*, No. 15 Civ. 3533, 2015 WL 6125526, at *4 (S.D.N.Y. Oct. 16, 2015); *see also In re AM Int'l Inc. Sec. Litig.*, 606 F.Supp. 600, 607 (S.D.N.Y. 1985); *Reingold v. Deloitte, Haskins & Sells*, 599 F.Supp. 1241, 1249, 1254 n.10 (S.D.N.Y. 1984); *In re Lernout & Hauspie Sec. Litig.*, 230 F.Supp.2d 152,170–71 (D.Mass. 2002); *Otto Candies, LLC v. KPMG, LLP*, 2020 WL 4917596, at *17 (Del. Ch. Aug. 21, 2020), *order entered*, 2020 WL 5517439 (Del. Ch. Sept. 10, 2020), *aff'd*, 251 A.3d 1016 (Del. 2021).

Swiss statute, and 23 of the 29 Credit Suisse Individual Defendants in this case were also named as defendants in *Cattan*." The Credit Suisse Defendants correctly characterize the instant action as, "Plaintiff[s'] attempt to bring the same case in a different forum in order to get a different answer from a different judge."

In light of these facts, Plaintiffs' choice of forum will not be given the deference for which Plaintiffs hoped. *See Niv v. Hilton Hotels Corp.*, 710 F.Supp.2d 328, 335 (S.D.N.Y. 2008). As in *In re Alcon*, 719 F.Supp.2d at 271 n.6, the Court notes "that the level of deference here is tied primarily to the overwhelmingly Swiss nature of the . . . conduct at issue."

But while "a lesser degree of deference to the plaintiff's choice bolsters the defendant's case," it "does not guarantee dismissal." *Iragorri*, 274 F.3d at 74. And so we turn to the next factor.

### (2) Adequacy of Switzerland as a Forum

The next step of the *forum non conveniens* inquiry is to determine the existence of a presently available alternative forum in which Plaintiffs can litigate their claim. *Ramirez de Arellano v. Starwood Hotels & Resorts Worldwide, Inc.*, 448 F.Supp.2d 520, 527 (S.D.N.Y. 2006) (citing *Norex*, 416 F.3d at 160; *Iragorri*, 274 F.3d at 73). The Credit Suisse Defendants, as the movants, bear the burden of demonstrating that an adequate alternative forum exists. *In re Alcon*, 719 F.Supp.2d at 272 (citing *Bank of Credit & Com. Int'l (Overseas) Ltd.*, 273 F.3d at 248).

"An alternative forum is generally adequate if: (1) the defendants are subject to service of process there; and (2) the forum permits litigation of the subject matter of the dispute" "and offers remedies for the wrongs the plaintiff alleges, even if the causes of action and relief provided there are not identical in every respect to the claims the plaintiff demands or redress he

seeks in his chosen forum." *Bank of Credit & Com. Int'l (Overseas) Ltd.*, 273 F.3d at 246

(internal quotation and citations omitted); *Do Rosario Veiga*, 486 F.Supp.2d at 303 (citations

omitted); *R. Maganlal & Co.*, 942 F.2d at 167. "[A]n adequate forum does not exist if a statute of

limitations bars the bringing of the case in that forum," *Bank of Credit & Com. Int'l (Overseas)*

*Ltd.*, 273 F.3d at 246, and "'[i]n rare circumstances, . . . where the remedy offered by the other

forum is clearly unsatisfactory, the other forum may not be an adequate alternative . . . .'"

*Aguinda v. Texaco, Inc.*, 303 F.3d 470, 476–77 (2d Cir. 2002) (quoting *Piper Aircraft Co. v.*

*Reyno*, 454 U.S. 235, 255 n. 22 (1981)).

However, the district court may dismiss on *forum non conveniens* grounds, despite its

inability to make a definitive finding as to the adequacy of the foreign forum, if the court can

protect the non-moving party by making the dismissal conditional. *Bank of Credit & Com. Int'l*

*(Overseas) Ltd.*, 273 F.3d at 247–48; *see Do Rosario Veiga*, 486 F.Supp.2d at 305; *Strategic*

*Value Master Fund, Ltd. v. Cargill Financial Serv., Corp.*, 421 F.Supp.2d 741, 756 (S.D.N.Y.

2006). The court's "'justifiable belief' in the adequacy of an alternative forum has been held to

be a sufficient basis for a conditional dismissal in favor of a foreign forum." *Bank of Credit &*

*Com. Int'l (Overseas) Ltd.*, 273 F.3d at 247 (citing *Schertenleib v. Traum*, 589 F.2d 1156, 1163

(2d Cir. 1978); *Calavo Growers of California v. Generali Belgium*, 632 F.2d 963, 968 n.6 (2d

Cir. 1980); *Agyenkwa v. Am. Motors Corp.*, 622 F.Supp. 242, 244 n. 5 (E.D.N.Y. 1985); *Shields*

*v. Mi Ryung Constr. Co.*, 508 F.Supp. 891, 895 (S.D.N.Y. 1981)). "If, in the end, the court

asserts its 'justifiable belief' in the existence of an adequate alternative forum, it should cite to

evidence in the record that supports that belief." *Bank of Credit & Com. Int'l (Overseas) Ltd.*,

273 F.3d at 248.  The Second Circuit has held that "even when the district court 'justifiably

believes' that there is an adequate alternative forum, it is advisable to make any dismissal

conditional in nature when there is uncertainty or conflict between expert opinions with regard to foreign jurisdictional law." *Calavo*, 632 F.2d at 968 n.6.

Over forty years ago, the Second Circuit considered this very issue in *Schertenleib v. Traum*, 589 F.2d 1156, 1163 (2d Cir. 1978), where the defendant had argued that Switzerland was an adequate alternative forum:

> If litigation is in a clearly inconvenient forum, why should defendant and the court be burdened with its continuing there, if an alternative forum now exists so that plaintiff will not be without a remedy? When the alternative forum is foreign, particularly where, as here, it is a civil law country, our courts have difficulty discerning whether a non-resident defendant really would be subject to jurisdiction in the foreign country without his consent. Indeed, the court may receive conflicting expert opinions on this issue. If the defendant consents to suit in the foreign alternate forum, and if that appears to be sufficient under the foreign law, why waste the litigants' money and the court's time in what is essentially an unnecessary and difficult inquiry into the further intricacies of foreign jurisdictional law?

"[T]he conditional dismissal device obviates the need for extensive inquiry into foreign jurisdictional law, since if the foreign court refuses to take jurisdiction, 'plaintiff is still protected by the conditional nature of the dismissal.'" *Calavo*, 632 F.2d at 968 (quoting *Schertenleib*, 589 F.2d at 1163); *see Do Rosario Veiga*, 486 F.Supp.2d at 305. Conditioning *forum non conveniens* dismissal on Switzerland's willingness to hear the case would be "an effective method of protecting Plaintiffs and ensuring the availability of [Switzerland] as an alternative forum." *Rudersdal, EEOD v. Harris*, No. 1:18-cv-11072, 2020 WL 5836517, at *12 (S.D.N.Y. Sept. 30, 2020) (citations omitted); *see Blanco v. Banco Indus. de Venezuela*, 997 F.2d 974, 984 (2d Cir. 1993); *Gross v. British Broad. Corp.*, 386 F.3d 224, 234 (2d Cir. 2004).

Despite the conflicts among the parties' submissions, the Court "justifiably believes," *Bank of Credit & Com. Int'l*, 273 F.3d at 247–48, that a Swiss court would be inclined to hear the

claims asserted in Count One. A Swiss court indubitably has subject-matter jurisdiction over those claims – as will be discussed below, *see infra* pp. 58–60, the experts do not disagree over that – so as long as the Defendants consent to Swiss jurisdiction, it should be heard there. *See Varnelo v. Eastwind Transp., Ltd.*, No. 02 Civ. 2084, 2003 WL 230741, at *17 (S.D.N.Y. Feb. 3, 2003).

### 1. A Swiss Court Would Be Inclined to Adjudicate This Dispute

Before a U.S. district court can dismiss a case on *forum non conveniens* grounds, the court must find that the proposed alternative forum – Switzerland – would take cognizance of the case. There appears to be no doubt on that score.

The Court finds that Switzerland permits litigation of the subject matter of this dispute. The essence of the Plaintiffs' claim is their assertion that the Credit Suisse Defendants breached the statutory duties they owed Credit Suisse shareholders under the Swiss Code of Obligations. *See In re Alcon*, 719 F.Supp.2d at 273. "[C]ourts in this Circuit . . . repeatedly found that Switzerland is an adequate forum for adjudication of civil disputes involving common law claims based on contract and tort principles." *Do Rosario Veiga*, 486 F.Supp.2d at 304. The fact that this claim arises under Swiss law makes that all the clearer: Dr. Perucchi, Plaintiffs' Swiss law expert, points out that Article 151, Sec. 1 of the Swiss Private International Law Act (PILA) authorizes suit in a case involving corporate misconduct against "any liable defendant" in the place of the corporation's domicile – which, in the case of Credit Suisse, is Zurich, Switzerland. Perucchi Decl. ¶ 66. And PILA Article 5, Section 3(b) provides that a Swiss court

may not decline to exercise jurisdiction in a case to which Swiss law applies; Swiss law plainly governs the claims asserted in Count 1 of the complaint pending before this court.[9]

Additionally, according to Prof. Dr. Grolimund, the Credit Suisse Defendants' Swiss law expert, "the Swiss government expressly noted . . . that disputes concerning law regarding companies incorporated in Switzerland should *primarily* be brought before *Swiss* courts." Grolimund Decl. ¶ 44 (emphasis in original). Prof. Dr. Grolimund relied on Swiss law, *id.*, and referred to Swiss Federal Supreme Court decisions, *id.* ¶ 45, as support for his contention that "where a claim . . . involves allegations of systemic failure of the company's management generally, only the courts at the statutory seat of the company are suited to handle the action." Grolimund Decl. ¶ 46.

While Plaintiff's expert, Dr. Perucchi, insists that Swiss courts express no preference about whether such claims should be brought in Switzerland or elsewhere, I find that assertion unpersuasive – indeed, hard to credit. A Swiss court is certainly a better place to decide whether a U.S. corporation can be sued under Swiss law for participating in the mismanagement of a Swiss corporation.

However, preference is really of no moment. The issue on a *forum non conveniens* inquiry is whether the foreign court would decline to take jurisdiction. Dr. Perucchi does not disagree that a Swiss court is vested with jurisdiction over the dispute here pleaded and does not opine that a Swiss court would refuse to entertain it were the case transferred there. So we have no clash of experts here.

---

[9]   An English translation of the Swiss Federal Act on Private International Law (PILA) can be found on the Swiss Confederation's online platform for federal law: https://www.fedlex.admin.ch/eli/cc/1988/1776_1776_1776/en, *archived at* https://perma.cc/2JTL-AC8Z.

What shrift a Swiss court would give those claims is of no moment to a *forum non conveniens* analysis – especially since, because the claims arise under Swiss law, a U.S. court could treat them no differently. If the claims are dismissible under Swiss law, they are just as dismissible in New York as in Zurich.

### 2. Amenability to Suit/Personal Jurisdiction

The next question to be considered is whether the defendants who have been sued in the United States can be sued in Switzerland on the claims asserted. When considering amenability to suit, the movants are required to demonstrate that *all defendants* are subject to the jurisdiction of Switzerland, their proposed alternative forum.[10]

To address the jurisdictional question, the parties have provided the Court with conflicting opinions by Swiss law experts. *See Varnelo*, 2003 WL 230741, at *15 (citing 17 James W. Moore, Moore's Federal Practice § 111.92 (3d ed. 2002)). Some of those opinions are addressed to the existence of personal jurisdiction. Others are addressed to the merits – specifically, to whether a viable claim is stated under Swiss law as against particular defendants or groups of defendants.

This court will not entertain merits-based Swiss law arguments when deciding the motion to dismiss on *forum non conveniens* grounds. If I cannot dispose of the *forum non conveniens* motion without deciding merits issues arising under foreign law – which is, in essence, what the moving defendants ask me to do with their motions to dismiss for failure to state a claim -- then I should simply keep the case. The whole point of sending a case to a foreign court is that the

---

[10]  *See PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 73 (2d Cir. 1998); *Rio Tinto PLC v. Vale S.A.*, No. 14 Civ. 3042, 2014 WL 719250, at *13 (S.D.N.Y. Dec. 17, 2014); *Concesionaria DHM, S.A. v. Int'l Fin. Corp.*, 307 F.Supp.2d 553, 563 (S.D.N.Y. 2004); *Nat'l Union Fire Ins. Co. of Pittsburgh v. BP Amoco, P.L.C.*, No. 03 Civ. 0200(GEL), 2003 WL 21180421, at *4 (S.D.N.Y. May 20, 2003); *ESI, Inc. v. Coastal Power Prod. Co.*, 995 F.Supp. 419, 426 (S.D.N.Y. 1998); *Madanes v. Madanes*, 981 F.Supp. 241, 265 (S.D.N.Y. 1997).

foreign court is a better place to decide things like whether a claim is stated under foreign and unfamiliar law.

So in addressing the Defendants' amenability to suit in Switzerland, I will focus squarely on whether the Defendants can be sued in Switzerland. I will also address whether they can be sued in New York.

### a. The Credit Suisse U.S. Entity Defendants

The Credit Suisse U.S. Entity Defendants are four U.S.-based subsidiaries (or former subsidiaries) of Credit Suisse AG. It is the Court's understanding that these four corporations are now wholly-owned subsidiaries of UBS. Dkt. Nos. 29, 71–73.

In addressing the amenability to suit of these four corporations in Switzerland, the parties' experts focus exclusively on whether claims can be stated against them under Swiss law – the issue this court has no intention of taking up unless and until I decide that the *forum non conveniens* motion should be denied. So there is no showing either that these U.S. subsidiaries of a Swiss corporation can or cannot be sued in Switzerland – without regard to whether the claims asserted against them would be dismissed on the merits. The only information in the record that bears on whether the U.S. Entity Defendants could be sued in Switzerland is provided by Dr. Perucchi, Plaintiffs' expert, who calls the Court's attention to Article 151 of the Swiss Private International Law Act (PILA), which provides "that liability actions in corporate matters can be brought against the liable defendants at the legal domicile of the Corporation, i.e., in the case of CS Group AG in Zurich, Switzerland. . . ." Perucchi Decl. ¶ 66. As I read this provision, it seems that the U.S. Entity Defendants are amenable to suit in Switzerland, at least on the type of claims asserted in this lawsuit. However, neither expert in foreign law has put in an affidavit confirming this court's supposition.

As Defendants bear the burden of demonstrating that Switzerland is a convenient forum for litigating claims against each of them, one would think that would be the end of the matter. But as noted above, *forum non conveniens* motions are granted all the time when parties that might not otherwise be amenable to service of process in a foreign country agree to be sued there. *Forum non conveniens* dismissal conditioned on agreeing to be sued in a foreign country is the norm.[11] While none of the Credit Suisse U.S. Entity Defendants has represented to the Court that it consents to the jurisdiction of Switzerland, *see Aguinda*, 303 F.3d at 477, by making this motion, they have intimated that conditional dismissal would result in their consenting to be sued in Switzerland. They are, after all, subsidiaries of a Swiss corporation. Dkt. Nos. 29, 71–73. The nature of the claims asserted certainly suggests that this may be one of the many cases best resolved in the country whose law governs the claim in suit.

### b.  The Credit Suisse Individual Defendants

The experts do address the issue of whether the individual Credit Suisse Defendants are amenable to suit in Switzerland. The Credit Suisse Defendants' Swiss law expert, Prof. Dr. Grolimund, explains that the Swiss courts have jurisdiction over all the Credit Suisse Individual Defendants – its officers and directors – because "the basic forum for all claims in corporate law matters including actions against directors and officers is at the statutory seat of the company," which, in this case, is Credit Suisse's statutory seat, Zurich. Grolimund Decl. ¶ 47. Prof. Dr. Grolimund states that, "With respect to directors' and officers' liability cases, the Swiss Federal

---

[11]   *See Rentokil-Initial Pension Scheme v. Citigroup Inc.*, 614 Fed.Appx. 27, 28 n.1 (2d Cir. 2015); *Spahic v. Int'l Ctr. for Transitional Just. Inc.*, No. 18-cv-0057, 2019 WL 7605895, at *16 (S.D.N.Y. Apr. 25, 2019); *In re Citigroup Inc. Sec. Litig.*, No. 12 Civ. 6653, 2014 WL 470894, at *7 (S.D.N.Y. Feb. 6, 2014); *Kirch v. Liberty Media Corp.*, No. 04 Civ. 667, 2006 WL 3247363, at *10 (S.D.N.Y. Nov. 8, 2006); *Van Der Velde ex rel. Van Der Velde v. Philip Morris Inc.*, No. 02 Civ. 783, 2004 WL 48891, at *8 (S.D.N.Y. Jan. 9, 2004); *PT United Can Co.*, 1997 WL 31194, at *6; *Doe v. Hyland Therapeutics Div.*, 807 F.Supp. 1117, 1133 (S.D.N.Y. 1992).

Supreme Court has repeatedly held that jurisdiction of the courts at the place of incorporation of the company is particularly justified because of the proximity between such courts and the underlying facts in dispute . . . ." *Id.* ¶ 45 (internal citation omitted). He identifies the Commercial Court of Zurich as competent to consider Plaintiffs' Swiss law claim, and notes that, regardless of where the Credit Suisse Individual Defendants are domiciled, the Commercial Court of Zurich has personal jurisdiction over them by virtue of their positions in the company, whether through the Lugano Convention, Swiss company law, or both. Grolimund Decl. ¶¶ 47–50.

Dr. Perucchi asserts that Switzerland lacks personal jurisdiction over all Defendants. Perucchi Decl. ¶ 15. Regarding the Credit Suisse Individual Defendants, he states that, "Neither Swiss substantive law, nor Swiss civil procedure rules, nor Credit Suisse's governing documents are opposed to — or attempt to preclude — having a shareholder file a suit against directors and officers of a Swiss company or third parties in a court outside of Switzerland seeking damages for violation of Swiss or other laws." *Id.* ¶ 63. He adds that: "There is no Swiss provision in the [Code of Obligations] or elsewhere requiring that a shareholder suit for damages against directors and officers of a Swiss corporation (or third parties) be brought before a Swiss court," *id.* ¶ 65; "the applicable procedural rules in the PILA contain no mandatory provision as to the proper court to file a shareholder suit for damages." *Id.* ¶ 66. But then he says, "While Article 151 Section 1 PILA does state that liability actions in corporate matters can be brought against the liable defendants at the legal domicile of the Corporation, i.e., in the case of CS Group AG in Zurich, Switzerland, this rule is not mandatory, plaintiffs are free to sue the defendants somewhere else." *Id.*

Once again, Dr. Perucchi speaks about the possibility that suit can be brought in more than one locale – not about whether Swiss courts have jurisdiction over the Credit Suisse Individual Defendants. Nothing in Dr. Perucchi's opinion refutes Prof. Dr. Grolimund's assertion that Switzerland has personal jurisdiction over the Credit Suisse Individual Defendants by virtue of their positions in Credit Suisse and the fact that the claims asserted against them arise out of their managerial responsibilities over Credit Suisse. Quite the contrary: Dr. Perucchi admits that Article 151 Sec. 1 of the Swiss Private International Law Act (PILA) "does state that liability actions in corporate matters can be brought against the liable defendants in the domicile of the Corporation" – i.e., in Zurich.

So there appears to be no question here – the Credit Suisse Individual Defendants can all be sued in Switzerland simply by virtue of the nature of the claims asserted against them. Dr. Perucchi's opinion that Switzerland would have no problem if the Individual Defendants were sued in the United States in a shareholder suit for damages under Swiss law does not undermine that result. While he argues that the terms Prof. Dr. Grolimund used "are a mischaracterization/fabrication to create the false impression that Article 151 PILA somehow favors liability lawsuits against directors and officers being brought in Switzerland over lawsuits being brought in a foreign court outside of Switzerland," *Id.* ¶ 71, favoring is not the inquiry in which this court is engaged. Whether Swiss courts have or lack a preference about where such claims should be litigated is above my pay grade. The inquiry is whether the Defendants can be sued in Switzerland, and then whether Switzerland is a more convenient forum. *Norex*, 416 F.3d at 157. Both experts agree that they can be.

In order to get out of this box, Dr. Perucchi also states that: "Since the case is pleaded under Article 41 CO, most of the Defendants cannot be sued in a Swiss court, because they are

not domiciled or have no habitual residence in Switzerland, as it is required by Article 129 [Swiss Private International Law Act]." Perucchi Decl. ¶ 74. He explains, "As pleaded in the Complaint, the vast majority of defendants are domiciled in New York, that is the place where they live and work, and where they committed the illegal acts and omissions they are liable for. For all these defendants, Swiss courts lack personal jurisdiction over them." *Id.* Dr. Perucchi concludes that, "New York is the place of general personal jurisdiction over the vast majority of Defendants." *Id.* ¶ 66.

Article 41 of the Swiss Code of Obligations appears to be the section relating to general liability in tort, and Article 129 of PILA does appear to suggest that, if personal jurisdiction were founded solely on a claim brought under Article 41, a Swiss court might not have personal jurisdiction over at least some of the Credit Suisse Individual Defendants. To this there are two obvious answers.

First, given the factual allegations in the pleading, every contention asserted by Plaintiffs in the context of their Swiss law claim is in the nature of a Swiss corporate liability claim, rather than some form of general tortious wrongdoing. As to such claims, even Dr. Perucchi agrees that Article 151 of the PILA confers personal jurisdiction over the Defendants in Switzerland.

Second, while Plaintiffs invoke Article 41, not a single fact is pleaded in the complaint that appears to state a claim in tort, as opposed to a claim for mismanagement. Merely citing a section of the Swiss Code of Obligations, without pleading facts tending to show some independent violation of that section that is not also a violation of Arts. 716a, 717, 754, or 755, does not undermine the demonstration that the Swiss court in Zurich would have jurisdiction over all of the alleged miscreants who participated in the downfall of Credit Suisse.

Additionally, Section 129 of the PILA provides that when a tort claim pertains to the operations of an establishment (and the First Cause of Action indubitably applies to the operation of Credit Suisse), "the courts at the place of establishment have jurisdiction" – which is to say, the courts of Switzerland, where Credit Suisse was established until its demise, would have jurisdiction over a tort claim. Perucchi Decl. ¶ 73.

To the extent that Article 129 refers to the domicile or habitual residence of a defendant, it is simply to say that Swiss courts in those places have jurisdiction to hear actions in tort against that defendant. *Id.* It does not say that a foreign defendant who commits a tort with serious ramifications in Switzerland cannot be sued in Switzerland.

Moreover, as even Dr. Perucchi concedes, not all of the Credit Suisse Individual Defendants are New Yorkers. *Id.* ¶ 74. And it is highly likely that New York does NOT afford an adequate forum in which to sue *all* of the Credit Suisse Individual Defendants, whether for violations of Swiss law or anything else. Thirteen of the Individual Defendants, including ten of the Credit Suisse Individual Defendants, have moved to dismiss the complaint against them on the ground that this court lacks personal jurisdiction over them pursuant to Rule 12(b)(2) of the Federal Rules of Procedure. It is incorrect to suggest, as Dr. Perucchi has, that Plaintiffs have made a prima facie case that these ten individuals can be sued in New York. *See Whitaker v. Am. Telecasting, Inc.,* 261 F.3d 196, 208 (2d Cir. 2001); *Ball v. Metallurgie Hoboken-Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir. 1990); *Maersk, Inc.,* 554 F.Supp.2d at 440. Plaintiffs do not plead or aver facts that, if credited, would suffice to establish either general or specific jurisdiction over the Credit Suisse Individual Defendants who have moved to dismiss for want of personal jurisdiction. *See Whitaker,* 261 F.3d at 208. While courts must construe the jurisdictional allegations in the light most favorable to the plaintiff, *see A.I. Trade Fin., Inc. v. Petra Bank,* 989

F.2d 76, 79–80 (2d Cir. 1993), the Court need not accept either party's legal conclusions as true, nor will it draw "argumentative inferences" in either party's favor. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012) (internal quotation omitted). Plaintiffs must "make allegations establishing jurisdiction with some 'factual specificity'" and "cannot establish jurisdiction through conclusory assertions alone." *Cont'l Indus. Grp., Inc. v. Equate Petrochemical Co.*, 586 Fed.Appx. 768, 769 (2d Cir. 2014) (citing *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998). But they offer little more than conclusory allegations. And they do so generally as to almost all the Individual Defendants. "To allege personal jurisdiction over a defendant, group pleading is not permitted. Instead, the plaintiff is required to establish personal jurisdiction separately over each defendant." *In re Aegean*, 529 F.Supp.3d at 135.

The Credit Suisse Individual Defendants who have moved for Rule 12(b)(2) dismissal – Bianchi, Bohnet, Dougan, Macia, Mathers, Nargolwala, Ribeiro, Schwan, Tiner, and Warner – argue that: (1) this court lacks general jurisdiction over them because – despite Plaintiffs' allegations, Compl. ¶ 124 – none of them is domiciled in New York; and (2) this court lacks specific jurisdiction over them because there are no allegations that they engaged in any specific act or conduct in New York that gave rise to the claims asserted. They have submitted a declaration in support of their claim that they do not currently reside in New York and were not based in Credit Suisse's New York office during the time of their board service, Belzer Decl. ¶¶ 8–9, and they correctly characterize the state of the pleading as against them. Plaintiffs largely limit themselves to patently inadequate broad and conclusory statements like statements like, "Defendants transact business in the United States, including in this District" and Credit Suisse's "Directors and Officers have purposefully availed themselves of the privilege of accessing New

York's commercial and financial markets for their business purposes and their personal economic gain, selling products and services to thousands of New York residents." *See* Compl. ¶¶ 87–115, 124, 146–47, 162; Opp. Memo, at 65–66; *see also Rucker v. IQ Data Int'l, Inc.*, No. 22-cv-717, 2022 WL 17542030, at \*3 (S.D.N.Y. Dec. 5, 2022); *DeLeon v. Dunaway*, No. 7:22-cv-6039, 2022 WL 3902734, at \*1 (S.D.N.Y. Aug. 30, 2022). However, "conclusory non-fact specific jurisdictional allegations or a legal conclusion couched as a factual allegation will not establish a *prima facie* showing of jurisdiction." *Tamam v. Fransabank Sal*, 677 F.Supp.2d 720, 725–26 (S.D.N.Y. 2010) (citing *Jazini*, 148 F.3d at 185).

So while Prof. Dr. Grolimund assures the Court that these Individual Defendants – all the Individual Defendants, including those who are in fact domiciled in New York – can be sued in Zurich because of the nature of the claims asserted against them, it seems doubtful that all of them can be sued in New York for violating Swiss law. That strongly suggests that dismissal on *forum non conveniens* grounds would be a good idea.

Finally, to the extent that any Credit Suisse Individual Defendant who has moved for dismissal on *forum non conveniens* grounds (and all of them have) is not amenable to suit in Zurich, the very making of the motion indicates that s/he should be willing to agree to jurisdiction in that court – which, again, can be viewed as support for a conditional dismissal.

### c.  The KPMG Defendants

The KPMG Defendants, corporate and individual (including specifically the KPMG RICO Defendants), have joined in the Credit Suisse Defendants' motion to dismiss on *forum non conveniens* grounds. They rely on Credit Suisse's arguments and do not make any of their own. That, in the opinion of this court, is a mistake, because while the Credit Suisse U.S. Entity

Defendants and Individual Defendants appear to stand in the same relation to the Swiss Code of

Obligations, KPMG LLP, as the purported outside auditor, does not. The allegations against the

KPMG Defendants under Swiss law are not just that they participated in the mismanagement of

Credit Suisse, but that they performed deficient audits of Credit Suisse, in violation of Art. 755

of the Swiss Code of Obligations, which provides, "All persons engaged in auditing the annual

and consolidated accounts, the company's foundation . . . are liable both to the company and to

the individual shareholders and creditors for the losses arising from any intentional or negligent

breach of their duties." *See* Compl. ¶¶ 22, 125, 221, 411–12, 430, 479.

Neither Prof. Dr. Grolimund nor Dr. Perucchi nor Prof. Dr. Bärtschi – the Swiss law

expert retained by KPMG LLP and two of the KPMG Individual Defendants, Knopp and

Newinski – opines on the question of Swiss jurisdiction over New York-based KPMG LLP. Prof.

Dr. Grolimund does not discuss jurisdictional issues as related to any of the KPMG Defendants

in his declaration. Prof. Dr. Bärtschi contends that the claims against KPMG LLP should be

dismissed because KPMG LLP was not Credit Suisse's statutory auditor – KPMG AG was – and

so no viable claim lies against KPMG LLP or its U.S.-based employees under the Swiss Code of

Obligations. Bärtschi Decl. ¶¶ 13, 16, 18–21. As Prof. Dr. Bärtschi argues, "There is no

precedent for extending the obligations of a Swiss statutory auditor to its US-based network

firm" and "Swiss law is strict in treating different legal entities separately." *Id.* ¶¶ 19–21. But

that is a Rule 12(b)(6) argument, one that this court has no business addressing unless it denies

the *forum non conveniens* motion.

Contrary to Prof. Dr. Bärtschi's opinion, Dr. Perucchi, Plaintiffs' Swiss law expert,

asserts that a claim does lie against the KPMG Defendants because "each of them owed statutory

duties to Plaintiffs and other class members" since they allegedly "audited the accounts of the

Credit Suisse Entity Defendants, and therefore engaged in the auditing of the annual and consolidated accounts of CS Group AG." Perucchi Decl. ¶¶ 14, 37. On the personal jurisdiction issue regarding the KPMG Individual Defendants, Dr. Perucchi's opinion is the same as his opinion regarding the Credit Suisse Individual Defendants discussed above – that Switzerland lacks personal jurisdiction over all of the Defendants domiciled in the United States. *See supra* pp. 64–65; Perucchi Decl. ¶¶ 73–77.

We have here a dispute among experts over whether any claim lies against the KPMG Defendants who are sued in this lawsuit under Swiss corporate law. I have already indicated that any such dispute is best resolved by a Swiss court.

In its motion to dismiss, the KPMG Defendants rely entirely on merits-based arguments – arguments as to which there is a difference of opinion among the Swiss law experts. And again I say: this court will not resolve merits-based issues under Swiss law and then send whatever remains of the case to Switzerland on the basis of *forum non conveniens*. If it is convenient for this court to resolve some disputed issues of Swiss law here, then it is convenient for me to resolve them all.[12] Either all disputed issues of Swiss law get resolved in a Swiss court or they all get resolved this court. The middle ground that Defendants seem to hope for is simply not available to them.

It is not clear from the sparse record before me whether any or all of the KPMG Defendants would be subject to the jurisdiction of the courts of Switzerland absent their consent.

---

[12] The issue of Swiss law discussed at pages 19–23 above in the context of RICO standing and the *Rand* exception is, as it happens, undisputed. As was explained there, Swiss law, by its terms, imposes identical duties on members of the board of directors, all persons engaged in management of the corporation, and external auditors to a corporation and its shareholders. Arts. 754, 755 of the Swiss Code of Obligations. The fact that Swiss law appears to allow both the corporation and its shareholder to bring suit to vindicate those duties does not contradict the plain text of the statute, which imposes exactly the same duty to corporation and shareholder *in haec verba*. By contrast, the parties' experts clash over almost every aspect of the claims asserted against the KPMG Defendants, from whether they can be sued to where they can be sued.

*See Lo v. Amsterdam & Sauer Ltd.*, No. 91 Civ. 4389, 1992 WL 233874, at *7 (S.D.N.Y. Sept. 8, 1992). However it is also not clear that some of them could be sued in New York. Three of the eleven KPMG Individual Defendants have moved to dismiss these actions on the ground that this court lacks jurisdiction over them. Like the Credit Suisse Individual Defendants who moved to dismiss for want of personal jurisdiction in the Southern District of New York, Defendants Bradley, Thomas, and Veihmeyer argue that: (1) this court lacks general jurisdiction over them because – again, despite Plaintiffs' conclusory and unsworn allegations, *id.* ¶ 124 – none of them is domiciled in New York, and (2) this court lacks specific jurisdiction over them because Plaintiffs failed to allege that any individual within this group of defendants transacted any business or engaged in any other conduct establishing long-arm jurisdiction in New York. Thomas also argues that he has not been served, which seems to be the case based on my review of the docket.

The KPMG Defendants' joinder in the *forum non conveniens* motion is perfunctory and pro forma, but if this case is going to be litigated in Switzerland, all of it should be litigated in Switzerland. *See In re Alcon*, 719 F.Supp.2d at 279. And one must assume that, by joining in the *forum non conveniens* motion, the KPMG Defendants are willing to be sued on the claims asserted against the in Count One in Switzerland.

### 3. Statute of Limitations

"[A]n adequate forum does not exist if a statute of limitations bars the bringing of the case in that forum." *Bank of Credit & Com. Int'l (Overseas) Ltd.*, 273 F.3d at 246 (citation omitted).

The parties provide the Court with expert testimony on the statute of limitations applicable to the claims asserted in the First Cause of Action. Predictably, the experts disagree about whether portions of Plaintiffs' claim are or are not time-barred. *Compare* Grolimund Decl. 51–52 *with* Perucchi Decl. ¶¶ 128–147. But the experts agree on one thing: the applicable statute of limitations is dictated by Swiss law, because the claims asserted arise under Swiss law, and not by U.S. law, even if the case is heard in an American court. Which means that this court is again confronted with the need to decide an issue of Swiss law in a situation that has, "At this point . . . become[] a battle of experts." *In re CINAR Corp. Sec. Litig.*, 186 F.Supp.2d 279, 299 (E.D.N.Y. 2002).

In the United States, courts overwhelmingly hold that analysis of a foreign legal system's statute of limitations issues is more appropriately conducted by the foreign court. *See In re Air Crash Off Long Island, N.Y., on July 17, 1996*, 65 F.Supp.2d 207, 215 (S.D.N.Y. 1999); *Awadallah v. W. Union Co.*, No. 14-cv-3493, 2016 WL 11469858, at *5 (E.D.N.Y. Mar. 30, 2016). As no one has argued that *all* of Plaintiffs' Swiss law claim is barred by either statute of limitations discussed by the Swiss law experts, the open statute of limitations question does not render Switzerland an inadequate forum. On the contrary, it renders Switzerland the correct forum in which to resolve this dispute.

### 4. Plaintiffs' Other Arguments Do Not Make Switzerland An Inadequate Forum

Plaintiffs make a number of arguments about why Switzerland is an inadequate forum. None is persuasive.

First, Plaintiffs claim that the Swiss legal system is not presently available to them due to how Swiss procedural rules function and for various "structural reasons." What that means is that

they would have to spend some money – more than the $400 filing fee required by this court – to commence an action in Switzerland.

Plaintiffs point out that, under Swiss law, a plaintiff is required to post bonds for court costs. Compl. ¶ 210. The amount of security depends upon the damages sought. *Id.* ¶¶ 190, 192–93. Because Plaintiffs are seeking damages measured in the hundreds of millions of dollars – the diminution in value of securities held by members of the proposed class over a period of ten years – they claim that "the bond would be over $50 million by any measure." *Id.* ¶ 193.

Dr. Perucchi believes that the amount would be at least $556 million USD. Perucchi Decl. ¶ 83. Dr. Perucchi opined that the "prohibitive, excessive costs of a shareholder suit are an effective obstacle to lawsuits like this one in Switzerland." *Id.* ¶ 79. Dr. Perucchi avers that Swiss courts "invariably require *full* advance payment of court fees in *all* court proceedings, irrespective of the wording if Article 98 CPC . . . ." *id.* (emphasis in original), and states that the Federal Supreme Court has "***confirmed*** explicitly that the Zurich tariffs ***comply*** with the constitutional principle of proportionality and with the 'cost recovery principle.'" *Id.* (emphasis in original, internal citation omitted).

Predictably, the Credit Suisse Defendants' expert disagrees: Prof. Dr. Grolimund writes, "Plaintiff[s'] assertion that he would have to post a $50 million bond . . . is baseless. To my knowledge, a bond requirement in an amount even remotely approaching $50 million would be entirely unprecedented" because "According to the Swiss Federal Supreme Court, costs must not render court access prohibitive or excessively cumbersome." Grolimund Decl. ¶ 55, 57. Prof. Dr. Grolimund states that the administration of Swiss court fees must comply with certain principles, such as: the cost recovery principle, which sets an upper limit of payments for costs; and the principle of proportionality, which provides that a fee is not to be manifestly disproportionate to

the economic benefit of the service provided by the state and is to remain within reasonable limits. *Id.* ¶¶ 55–56.

The fact that Plaintiffs may have to front some fees does not defeat a *forum non conveniens* motion. *See Global Art Exhibitions, Inc. v. Kuhn & Bülow Italia Versicherungsmakler GmbH*, 607 F.Supp.3d 421, 437 (S.D.N.Y. 2022).[13] "The bonding requirement does not affect the defendants' amenability to the service of process or the . . . court's ability to hear the dispute." *In re Bancredit Cayman Ltd.*, Bankr. No. 06-11026, 2008 WL 5396618, at *5 (Bankr. S.D.N.Y. Nov. 25, 2008).

Moreover, in this Circuit, claims of financial hardship to the plaintiff are not part of the calculus of determining whether an alternative forum is *available*. Instead, the Court takes financial hardship into account in the balancing of private and public interests related to the forum's convenience. *Murray v. British Broad. Corp.*, 81 F.3d 287, 292–93 (2d Cir. 1996); *Global Art Exhibitions, Inc.*, 607 F.Supp.3d at 437.

Plaintiffs also claim that in Switzerland, many features of commercial litigation that pertain in the United States are not allowed: lawyers cannot be retained on a contingent-fee basis, Compl. ¶ 195; class actions are not recognized, *id.* ¶ 191; Perucchi Decl. ¶¶ 96–98; and they would not be afforded a jury trial. Perucchi Decl. ¶ 111. As to this last argument, Plaintiffs contend that a *forum non conveniens* dismissal would effectively deprive them of a constitutional right, since they have demanded a jury.

But a forum need not be identical to a United States court to afford a convenient forum for the litigation of a fundamentally foreign dispute – as here, over the alleged mismanagement

---

13  *Petersen Energia Inversora, S.A.U. v. Arg. Republic*, No. 15-cv-2739, 2016 WL 4735367, at *11 (S.D.N.Y. Sept. 9, 2016); *Red Rock Holdings, Ltd. v. Union Bank Tr. Co.*, No. 97 Civ. 5008, 1998 WL 474094, at *6 (S.D.N.Y. Aug. 11, 1998); *In re Bancredit Cayman Ltd.*, Bankr. No. 06-11026, 2008 WL 5396618, at *5 (Bankr. S.D.N.Y. Nov. 25, 2008).

of a foreign corporation under foreign law. U.S. courts have repeatedly rejected the arguments propounded by Plaintiffs in opposition to the Credit Suisse Defendants' *forum non conveniens* motion. "The unavailability of beneficial litigation procedures similar to those available in the federal district courts does not render an alternative forum inadequate." *Blanco*, 997 F.2d at 982. "Courts in this District have also specifically and repeatedly held that the availability of contingency fees, class actions, or federal-style discovery is not dispositive of the adequacy of an alternative forum." *In re Alcon*, 719 F.Supp.2d at 273 (citations omitted).

With respect to contingency fee arrangements: "if the lack of a contingent-fee system were held determinative, then a case could almost never be dismissed because contingency fees are not allowed in most foreign forums." *Murray*, 81 F.3d at 293 (citing *Coakes v. Arabian Am. Oil Co.*, 831 F.2d 572, 576 (5th Cir. 1987) (quotation marks omitted)); *see Rudetsky v. O'Dowd*, 660 F.Supp. 341, 346 (E.D.N.Y. 1986).

The experts disagree over how easy it is to bring what Dr. Perucchi calls "mass or collective actions" in Switzerland. Perucchi Decl. ¶ 98. Prof. Dr. Grolimund insists that "Swiss legal practice has nevertheless developed a variety of options to address mass losses or claim," and asserts that "[b]esides the joinder of plaintiffs into one proceeding and the consolidation of proceedings, model claims and pilot proceedings are quite common in Switzerland." Grolimund Decl. ¶ 58. Dr. Perucchi cites to a Swiss Federal Council report from over ten years ago, which stated that, "The existing procedural vehicles to bring mass or collective actions to enforce claims (namely joinder of claims, representative actions by non-profit organizations, test or pilot cases are in practice insufficient and often unsuitable to effectively and efficiently enforce mass claims. By consequence, there is an enforcement vacuum in the existing system of legal protection." Perucchi Decl. ¶ 98.

However, it has long been settled that the unavailability of a class action mechanism that mirrors Rule 23 of the Federal Rules of Civil Procedure does not render a foreign forum inadequate. *In re Optimal U.S. Litig.*, 886 F.Supp.2d 298, 308 n.55 (S.D.N.Y. 2012).[14]

Finally, Switzerland is not an inadequate forum because Swiss law does not provide for a trial by jury. "The Second Circuit has held and favorably cited cases holding that lack of trial by jury or lack of discovery procedures as broad as those available in U.S. federal courts do not render a forum inadequate." *Arias Santos v. LATAM Airlines Grp. S.A.*, No. 18-cv-10835, 2019 WL 1745778, at *4 (S.D.N.Y. Apr. 17, 2019).[15] Indeed, "The more active role of the judge in civil law systems – for example: . . . the absence of jury trials – does not deprive litigants of due process, though it does shift some control over the proceedings from attorneys to the judge." *ACLI Intern. Commodity Serv., Inc. v. Banque Populaire Suisse*, 652 F.Supp. 1289, 1295–96 (S.D.N.Y. 1987).

And of course many of these very assertions have already been litigated in the context of this class's claims against many of the same Credit Suisse Defendants before Justice Masley, who concluded that Switzerland offered plaintiffs an adequate alternative forum. *Cattan*, 2023 WL 2868337, at *7. Justice Masley found that the named plaintiff did not have a single plausible

---

[14]   *See In re Herald*, 540 Fed.Appx. 19, 28 (2d Cir. 2013); *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 478 (2d Cir. 2002); *In re Alcon S'holder Litig.*, 719 F.Supp.2d 263, 273 (S.D.N.Y. 2010); *In re Eur. Aeronautic Def. & Space Co. Sec. Litig.*, 703 F.Supp.2d 348, 360–61 (S.D.N.Y. 2010); *Gilstrap v. Radianz Ltd.*, 443 F.Supp.2d 474, 482 (S.D.N.Y. 2006); *In re Lloyd's Am. Tr. Fund Litig.*, 954 F.Supp. 656, 673 (S.D.N.Y. 1997); *In re Union Carbide Corp. Gas Plant Disaster at Bhopal, India in Dec., 1984*, 634 F.Supp.842, 851 (S.D.N.Y. 1986).

[15]   *See Lust v. Nederlandse Programma Stichting*, 501 Fed.Appx. 13, 14–15 (2d Cir. 2012); *Blanco*, 997 F.2d at 982; *In re Union Carbide Corp. Gas Plant Disaster at Bhopal*, 809 F.2d 195, 199, 202 (2d Cir. 1987); *Kravitz v. Binda*, No. 17-cv-07461, 2020 WL 927534, at *11 (S.D.N.Y. Jan. 21, 2020); *Wenzel v. Marriott Intern., Inc.*, No. 13 Civ. 8335, 2014 WL 6603414, at *5 (S.D.N.Y. Nov. 17, 2014); *NCA Holding Corp. v. Norddeutsche Landesbank Girozentrale*, No. 96 Civ. 9321, 1999 WL 39539, at *2 (S.D.N.Y. Jan. 28, 1999); *Breindel & Ferstendig v. Willis Faber & Dumas Ltd.*, No. 95 Civ. 7905, 1996 WL 413727, at *3 (S.D.N.Y. July 24, 1996); *Zweig v. Nat'l Mortg. Bank of Greece*, No. 91 Civ. 5482, 1993 WL 227663, at *8 (S.D.N.Y. June 21, 1993); *Shields v. Mi Ryung Constr. Co.*, 508 F.Supp. 891, 895 (S.D.N.Y. 1981); *Brown v. Marriott Intern., Inc.*, No. 14-cv-5960, 2017 WL 4484194, at *5 n.4 (E.D.N.Y. Sept. 29, 2017); *Agyenkwa v. Am. Motors Corp.*, 622 F.Supp. 242, 245 (E.D.N.Y. 1985).

argument in support of his assertion that Switzerland is an inadequate forum, and called attention to the fact that, "there are numerous New York cases dismissing civil actions in favor of Swiss proceedings." *Id.* In *Cattan*, 2023 WL 2868337 at *7, faced with conflicting opinions by Swiss law experts on possible costs levied on the plaintiff by a Swiss court, Justice Masley sided with the defendants' expert, noting that, "Swiss courts look to a variety of facts and circumstances in determining the amount of a plaintiff's advance, and would not impose an excessive fee by rote, as plaintiff suggests." *Id.*

I agree with Justice Masley that none of the arguments advanced by Plaintiffs in the instant action renders Switzerland inadequate as a forum in which to litigate a claim alleging violations of the Swiss Code of Obligations. *Cattan*, 2023 WL 2868337, at *8.

### (3) The Interest of Justice Favor Litigating the First Cause of Action in Switzerland

The last step in the *forum non conveniens* analysis is to weigh two sets of factors – the private interest factors, and the public interest factors – to determine whether adjudication is more appropriate in the present forum or in an alternative forum. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947); *see Online Payment Sol. Inc. v. Svenska Handelsbanken AB*, 638 F.Supp.2d 375, 386 (S.D.N.Y. 2009). "Because much of the [*forum non conveniens*] doctrine's strength derives from its flexibility and each case turns on its own facts, a single factor is rarely dispositive." *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 29 (2d Cir. 2002). "*Gilbert* instructs reviewing courts to disturb a plaintiff's choice of forum only where the balance of private and public interest considerations 'strongly favors' the moving defendant." *In re Alcon*, 719 F.Supp.2d at 275.

In this case, the balance of private and public interest factors strongly favors having the First Cause of Action litigated in Switzerland.

### 1. Private Interests

The private interests enumerated in *Gilbert*, 330 U.S. at 508–09, embrace: the ease of access to evidence; the cost for witnesses to attend trial; the availability of compulsory process; and other factors that might shorten trial or make it less expensive. *Cap. Currency Exch., N.V. v. Nat'l Westminster Bank PLC*, 155 F.3d 603, 609 (2d Cir. 1998) (citing *Piper*, 454 U.S. at 241; *Gilbert*, 330 U.S. at 508).

### a. Ease of Access to Evidence

"[I]n light of technological advances in transportation and communication, . . . the location of documents is a factor which is to be given less weight now." *Shtofmakher v. David*, No. 14 Civ. 6934, 2015 WL 5148832, at *3 (S.D.N.Y. Aug. 17, 2015). Nevertheless, after reviewing the parties' submissions, the Court is inclined to believe that the bulk of the evidence relevant to Plaintiffs' Swiss law claim will be far more accessible in Switzerland. *See In re Alcon*, 719 F.Supp.2d at 276.

"The parties, unsurprisingly, each contend that the bulk of relevant evidence is located in the jurisdiction in which they wish to try the case." *Van Der Velde ex rel. Van Der Velde v. Philip Morris Inc.*, No. 02 Civ. 783, 2004 WL 48891, at *4 (S.D.N.Y. Jan. 9, 2004). According to the Credit Suisse Defendants, the Board regularly met in Zurich, Switzerland, and vital documentary evidence – records, including agendas and minutes, related to Board meetings that took place in Zurich, Executive Board meetings, Shareholders' Annual General Meetings, Board compensation, and Credit Suisse finances – is located only in Switzerland, stored on Swiss servers. Belzer Decl. ¶ 7. An additional problem this documentary evidence presents is the possibility that the relevant documents are in French, Italian, or German and require translation into English. *See Fustok v. Banque Populaire Suisse*, 546 F.Supp. 506, 511 (S.D.N.Y. 1982).

The Credit Suisse Defendants note that additional evidence may be in Credit Suisse's offices anywhere around the globe, given the scope of Plaintiffs' allegations and Credit Suisse's global operations.

Were the case to remain in this court, the parties could only access documentary evidence in Switzerland (or in many other countries) in a manner that is compliant with Swiss legal restrictions. For Switzerland, at least, that means, "The parties would need to take evidence in Switzerland by way of international legal assistance, specifically based on the Hague Convention of March 18, 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters (the "Hague Evidence Convention")." Grolimund Decl. ¶ 69. Prof. Dr. Grolimund claims that Switzerland's acceptance of the Hague Evidence Convention is subject to certain limitations, outlined under Swiss law, *id.* ¶¶ 69–70, which include, for example, certain restrictions on Letters of Request issued for the purpose of obtaining pre-trial discovery. *Id.* ¶ 69.

Conversely, Plaintiffs claim that little discovery in Switzerland will be necessary, and, if such discovery is necessary, it will not be difficult to obtain. Plaintiffs insist that this is a New York case involving a big New York bank, big New York accounting firm, thousands of New York employees and thousands of New York shareholder victims who owned some of the 540+ million Credit Suisse shares in the United States – therefore, "the bulk of the evidence . . . needed for the case are here in New York." Compl. ¶ 151. Plaintiffs assert, in both the Complaint and their opposition papers, that "reams of evidence are in the Credit Suisse, KPMG, PwC and merger lawyers'/bankers' and the Individual Defendants' files here," and that the files of regulators/prosecutors in proceedings involving Credit Suisse and KPMG LLP are in SDNY, EDNY, EDVA, and DC. *Id.* To the extent that such evidence is in Switzerland, Dr. Perucchi claims that "it would be unproblematic to obtain and make available such evidence to be used in

New York within due course." Perucchi Decl. ¶ 120. That is hardly surprising, since U.S. courts engage in Hague Evidence Convention discovery with some frequency – at least, this court does. However, I am constrained to observe that such discovery is time consuming and frequently cumbersome.

I conclude that documents will be found in both Switzerland and New York – and likely in other locations around the world as well. However, there are several indicators that make it clear that Switzerland affords more ease of access to evidence. While documents about KPMG LLP (and presumably, its employees and other related individuals) are most likely located in New York, it appears far more likely that the evidence related to the allegedly deficient audits of Credit Suisse – audits that, as the pleadings reveal, were performed by KPMG AG, which is based in Switzerland – will be located in Switzerland.

Next, by order of the Swiss Government, Credit Suisse no longer exists. Opp. Memo, at 4. It has been subsumed by another Swiss bank, UBS, and the Credit Suisse U.S. Entity Defendants are now subsidiaries of UBS. Compl. ¶ 196; Dkt. Nos. 29, 73. UBS is not a party to this case, but it undoubtedly has custody of many of the corporate documents that would be needed to litigate the claims of mismanagement. That unusual fact favors sending the case to Switzerland. So does the need to translate documents so that they can be used in this court, which increases the cost of litigation.

And while in many cases, "this factor is not so relevant because the cost will be borne by the parties regardless of where the litigation takes place." *Celestin*, 2023 WL 6385339, at *8, the unusual corporate posture of the Credit Suisse U.S. Entity Defendants complicates that analysis. Unfortunately, no one has bothered to analyze how the forced merger of Credit Suisse into UBS plays into ease of access to evidence, but it can only be a complicating factor. I conclude that the

ease of evidence factor weigh in favor of Switzerland. *See LaSala v. TSB Bank, PLC*, 514

F.Supp.2d 447, 459 (S.D.N.Y. 2007).

### b. Cost for Witnesses

"Courts are . . . instructed to weigh the costs of producing . . . witnesses." *Gilstrap v.

Raidanz Ltd.*, 443 F.Supp.2d 474, 488 (S.D.N.Y. 2006) (citation omitted). Though "the

inevitable costs associated with this aspect of the suit can be alleviated under U.S. law by the

submission of letters rogatory and the availability of videotaped depositions," *Maersk, Inc.*, 554

F.Supp.2d at 454, "such a process has been recognized as time-consuming, and there is, of

course, a preference for live testimony." *Gilstrap*, 443 F.Supp.2d at 488 (citing *DiRienzo*, 294

F.3d at 30).

The parties disagree about the domiciles and residences of most of the relevant witnesses.

The Credit Suisse Defendants argue that litigation in this District will be unduly burdensome on

witnesses, as many likely witnesses are in Switzerland or elsewhere outside of New York. With

respect to the Individual Defendants, twelve of the Credit Suisse Individual Defendants either

reside in the United States but are not located in the Southern District of New York – they live

in Florida, Massachusetts, North Carolina, and Virginia – or live abroad, in Singapore,

Switzerland, and the United Kingdom. Belzer Del. ¶ 8. Although Plaintiffs contend that, "Most

of the Defendants are United States citizens; and many reside in New York City," Compl. ¶ 151,

they have only provided the Court with conclusory statements.

Based on the parties' submissions, the cost for witnesses factor appears to be less relevant

to this case. Few of the Individual Defendants live in Switzerland. There will be witnesses who

are not parties who live elsewhere, and taking their testimony will be cumbersome and subject to

local restrictions. But to the extent that travel is involved, the cost will "be borne by the parties regardless of where the litigation takes place." *Celestin*, 2023 WL 6385339, at *8.

### c. Compulsory Process

As discussed above, obtaining evidence and testimony in this case will likely implicate the Hague Evidence Convention. *See supra* pp. 79. "Courts in the Second Circuit have widely recognized that obtaining evidence through the Hague Convention and letters rogatory are [sic] cumbersome and inefficient, and hardly make litigation in the United States convenient." *Rabbi Jacob Joseph Sch. v. Allied Irish Banks, P.L.C.*, No. 11-cv-05801, 2012 WL 3746220, at *7 (E.D.N.Y. Aug. 27, 2012) (citations omitted). Issues of compulsory process and non-United-States-resident individual defendants were discussed by the court *In re Alcon*, 719 F.Supp.2d at 276:

> [I]f this dispute were litigated in this forum as Plaintiffs urge, the non-United-States-resident individual Defendants, unless subject to personal jurisdiction in the United States, would likely not be subject to compulsory process. There is also substantial risk that other key third-party witnesses, who reside in Switzerland or elsewhere in Europe, would not be within this Court's subpoena power. Even if some testimony could be obtained and preserved by deposition, to do so would implicate proceedings under the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, a prospect that entails significant amounts of time even in ordinary cases, and far more in complicated litigation such as this action. In all probability, these circumstances would cause not only greater financial hardships, but additional litigation and attendant significant delays in preparing the case for trial before this Court, and ultimately in resolving the merits of the dispute.

Setting aside issues of delay and expense, another concern, as articulated by Prof. Dr. Grolimund, is the possibility that relying on any form of compulsory process could risk a violation of Swiss law. *See* Grolimund Decl. ¶ 52.

Overall, "[t]his massive inefficiency and inconvenience that [using the Hague Evidence Convention] would create for defendants and plaintiffs is all the more striking given the existence of an alternative forum where many of these problems would not arise." *Rabbi Jacob Joseph Sch.*, 2012 WL 3746220, at *7 (citing *Reers v. Deutsche Bahn AG*, 320 F.Supp.2d 140, 162 (S.D.N.Y. 2004)) (internal quotation marks omitted)).

### d. Other Considerations

Plaintiffs cite to Switzerland's lack of contingent fee arrangements as a barrier to them litigating their Swiss law claim in Switzerland. However, "[t]he availability of [contingent fee] arrangements in the United States is based on a policy decision regarding the assertion of rights in American courts where the parties or the claims have some tangible connection with this country. The decision to permit contingent fee arrangements was not designed to suck foreign parties disputing foreign claims over foreign events into American courts." *Murray*, 81 F.3d at 294. This is a consideration of particular importance in this case because one of the claims being brought by the contingent fee attorneys in the United States is not a U.S-based claim; it arises under Swiss law. Normally, this claim would be adjudicated in Switzerland, where contingent fee arrangements are not available.

In their discussion of the *Gilbert* private interest factors, Plaintiffs reference related proceedings in this District, and the possibility of additional lawsuits against Credit Suisse in the United States and elsewhere. But "the Second Circuit has stated repeatedly that the existence of related proceedings is not even mentioned in *Gilbert*, and therefore should not be given much consideration." *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 230 F.Supp.2d 376, 391 (S.D.N.Y. 2002) (citations omitted); *see DiRienzo*, 294 F.3d at 31. Moreover, as noted earlier in this decision, the majority of those related proceedings allege securities fraud –

allegations that are mimicked by Plaintiffs' purported RICO claims, which have been dismissed. To the extent the existence of other suits against Credit Suisse might be at all relevant, keeping the claims that arise under Swiss law in this forum can only engender confusion and delay.

Additionally, as in *In re Alcon*, 719 F.Supp.2d at 276, "Questions surrounding the enforceability of a judgment rendered by this Court also weigh in favor of dismissal." The Credit Suisse Defendants advance the argument that Swiss law provides that a U.S. judgment would only be enforceable if the U.S. court has jurisdiction to adjudicate the matter *from a Swiss perspective*. According to Prof. Dr. Grolimund, "[t]he United States and Switzerland do not have a treaty providing for reciprocal recognition and enforcement of judgments in civil and commercial matters" and, in Switzerland, the recognition and enforcement of a U.S. judgment is governed by the principles laid out in PILA. Grolimund Decl. ¶ 59. Prof. Dr. Grolimund's interpretation of the relevant PILA provisions has led him to conclude that, "a New York court judgment would be recognized and enforced in Switzerland only against the Defendants domiciled in the United States. To obtain a judgment that would be enforceable in Switzerland against all Defendants (and that would in addition allow the right of recourse between all of the Defendants), the proceedings must occur in Switzerland." *Id.* ¶ 62.

Again, Dr. Perucchi disagrees – he claims that Prof. Dr. Grolimund "mischaracterizes the application of the PILA statutory rules," and argues that they "do not apply with regard to the vast majority of Defendants that are domiciled in the United States. . . . The SDNY judgment will be recognized and is enforceable in Switzerland against all Defendants domiciled in the US, with the exception of the few defendants having domicile in Switzerland." Perucchi Decl. ¶ 124. But that is precisely Prof. Dr. Grolimund's point – this court apparently cannot issue an enforceable judgment against a Swiss citizen on a claim arising under Swiss law, as the First

Cause of Action does. Moreover, there are defendants in this case who are neither citizens of the United States nor Switzerland – no expert offers any opinion suggesting that this court could issue a binding judgment on a claim arising under Swiss law as against them.

Based on the parties' submissions, that "were the issue to be presented, there would be no compelling reason to extend the reach of its authority extraterritorially and to force a Swiss court to decide whether to recognize a foreign court's resolution of this decisively Swiss dispute." *In re Alcon*, 719 F.Supp.2d at 278. That is especially true if, as Prof. Dr. Grolimund asserts, a Swiss judgment on the mismanagement claims asserted in Count I would be enforceable against all Defendants, no matter their citizenship.  Grolimund Decl. ¶ 62.

### 2.  Public Interests

The public interest factors enumerated in *Gilbert*, 330 U.S. at 508–09, include: the administrative difficulties associated with court congestion; the unfairness of imposing jury duty on a community with no relation to the litigation; the local interest in having localized controversies decided at home; and the avoidance of difficult problems in conflict of laws and the application of foreign law. *See Murray*, 81 F.3d at 293; *DiRienzo*, 294 F.3d at 31. These considerations also weigh heavily in favor of dismissal of this action. *See Do Rosario Veiga*, 486 F.Supp.2d at 307.

### a.  Administrative Difficulties

Here, administrative difficulties flowing from court congestion is not a significant factor. *See Giro, Inc. v. Berhad*, No. 10-CV-5550, 2011 WL 2183171, at *9 (S.D.N.Y. June 3, 2011). "The Southern District of New York may have one of the nation's busiest dockets, but its administration is very efficient." *Global Art Exhibitions, Inc.*, 607 F.Supp.3d at 440. The parties

do not offer any evidence that indicates that Swiss courts are any more congested than the busy courts in this District. *See Do Rosario Veiga*, 486 F.Supp.2d at 307.

In addition, the Court sees little administrative advantage in retaining Plaintiffs' Swiss law claim while litigating the Credit Suisse securities cases before this court. *See DiRienzo*, 294 F.3d at 31. Although some of the issues in these cases and various causes of action may overlap, they differ significantly, as the securities cases involve the application of American, rather than Swiss law – and as mentioned above, *see supra* pp. 83–84, that is more likely to engender confusion and delay than administrative convenience. "In any event, this circumstance is of little weight because the existence of related litigation is not one of the factors enumerated in *Gilbert*." *Id.* (citing *Guidi v. Inter-Cont'l Hotels Corp.*, 224 F.3d 142, 148 (2d Cir. 2002)).

### b.  Jury Duty

It is at least questionable whether the Plaintiffs have a right to a jury trial on a claim arising under Swiss law. However, neither side mentions the "jury duty" factor as weighing in favor of retention or dismissal. So as far as I am concerned, it is of no significance.

### c.  Local Interest

"[T]he public interest in having localized controversies decided at home" "requires an evaluation of which forum possesses a stronger local interest in the controversy" – the United States, or Switzerland. *TSB Bank, PLC*, 514 F.Supp.2d at 461.

Switzerland has a far stronger local interest in the controversy in this litigation of Plaintiffs' Swiss law claim, which, again, is centered on the alleged mismanagement of a Swiss corporation by its Board and Executive Board. *See Global Art Exhibitions, Inc.*, 607 F.Supp.3d at 440. Though it is true that KPMG LLP, at least some of the Credit Suisse and KPMG Individual Defendants, and all of the Credit Suisse U.S. Entity Defendants are "at home" in the United

States – "[w]hatever interest the United States has, it pales in comparison with that of Switzerland. Switzerland possesses a strong interest in regulating the conduct of banks within its borders." *LaSala v. UBS, AG*, 510 F.Supp.2d 213, 229 (S.D.N.Y. 2007) (citation omitted). The very fact that the Government of Switzerland has by fiat ended Credit Suisse's existence underscores the importance of adjudicating issues relating to the now-former Swiss bank in its home forum.

Plaintiffs contend that Switzerland itself is perhaps too interested in the outcome of the case. Compl. ¶ 196. In the Complaint, they write:

> The Swiss forum, *i.e.*, government, is not a disinterested sovereign merely providing a legal system to other parties for dispute resolution between private parties. The supposed alternative forum is a country where the sovereign is an interested party with direct, legal and economic interests in the outcome of the case that are adverse to plaintiff's interests, including litigation, where its officials and regulators could be sued for damages and/or to back up UBS's legal obligations as Credit Suisse's corporate successor.

*Id.* Plaintiffs assert that the "Swiss government faces liability for its negligent oversight of Credit Suisse and cannot be sued in Switzerland." *Id.* ¶¶ 197, 199.

Frankly, this screed only underscores that local Swiss interests lie at the core of this misguided lawsuit. It also suggests to this court that interests of international comity as between the U.S. and Switzerland are in favor of litigating claims of mismanagement by Credit Suisse's Board and executives in Switzerland, not the United States. The Southern District of New York has no interest in involving itself in matters that on their face have no relation to U.S. law and may have foreign policy implications. And to the extent Plaintiffs are suggesting that Swiss courts are incapable of dealing with claims of complicity by the Swiss government in Credit Suisse's downfall, they fail to understand that the Swiss judicial system, like its U.S. counterpart, enjoys constitutional independence from other branches of Swiss Government. According to

Prof. Dr. Grolimund, "[a]s a matter of Swiss constitutional law, the Swiss judicial system is separate and independent from the Swiss government and from Swiss regulators." Grolimund Decl. ¶ 63 (citation omitted). There is no reason to believe that a Swiss court is any less capable of addressing matters critical of the Swiss Government than this or any other U.S. court is capable of addressing matters critical of the U.S. Government – something we do all the time.

### d. Conflict of Laws and Application of Foreign Law

"The prevalence of foreign law in the [C]omplaint is also a factor in *forum non conveniens* analysis." *UBS, AG*, 510 F.Supp.2d at 230. Plaintiffs have alleged that the Defendants breached statutory duties enumerated in the Swiss Code of Obligations. In light of this, even they have conceded in their opposition papers that the need to apply Swiss law to some, or even all of the non-RICO claim, is a *Gilbert* factor that favors dismissal. Opp. Memo, at 63.

Allowing Plaintiffs' Swiss law claim to proceed in the Southern District in New York will require the Court to oversee a cause of action governed *exclusively* by foreign law. *Holzman v. Guoqiang Xin*, No. 12-cv-8405, 2015 WL 5544357, at *10 (S.D.N.Y. Sept. 18, 2015). "United States courts have 'virtually no interest in resolving' disputes governed *exclusively* by foreign law." *Id.* (quoting *Murray*, 81 F.3d at 293 (emphasis in original)).

Although "Determining the content of Swiss law is obviously easier at trial in Geneva," *Schertenleib*, 589 F.2d at 1165, U.S. "[t]rial courts may find and apply foreign law" and "may even use experts on foreign law to assist them." *In re Ski Train Fire*, 230 F.Supp.2d at 301. But this "necessitates the introduction of inevitably conflicting expert evidence on numerous questions of Swiss law, and it creates the uncertain and time-consuming task of resolving such questions by an American judge unversed in civil law tradition." *Schertenleib*, 589 F.2d at 1165.

Despite Plaintiffs' claim that "[n]o expert testimony is needed" and "[t]he language of [the Swiss law] statutes is clear," the parties have already begun to introduce conflicting expert declarations into this case: Plaintiffs, the Credit Suisse Defendants, and KPMG LLP and two of the KPMG Individual Defendants have submitted to the Court declarations by competing experts who have diverging opinions on various aspects of Swiss law. This indicates that the Swiss legal issues are less straightforward than Plaintiffs suggest. And given the nature of Plaintiffs' claim, this case will also likely require "the interpretation and translation of foreign legal statutes, texts, and treatises," *Cattan*, 2023 WL 2868337, at *6, as even Plaintiffs' Swiss law expert has confirmed that the Swiss Corporation Code, contained within the Swiss Code of Obligations, is "very different from United States corporations' codes." Perucchi Decl. ¶ 47.

Because Plaintiffs' Swiss law claim requires application of principles of Swiss law, "Switzerland is the forum with the most significant legal contacts with and the greatest jurisdictional interest in the adjudication of the controversy before the Court. Also for these reasons, an action should be tried in a forum familiar with the law governing the case. By contrast, the Court finds no compelling reason why the law and judicial resources of this forum should be applied to resolve this dispute, nor any overriding American policy interest that would be promoted or enforced by doing so." *Do Rosario Veiga*, 486 F.Supp.2d at 307–08.

In sum, although Plaintiffs are American citizens and some of the Defendants are American entities and individuals, the public and private interest factors overwhelmingly favor litigating the asserted claim for violation of Swiss law Switzerland. "Retaining jurisdiction in this district would not be convenient for the parties or the witnesses and would not promote principles of efficient and economically prudent litigation." *Tel. Sys. Intern., Inc. v. Network Telecom PLC*, 303 F.Supp.2d 377, 385 (S.D.N.Y. 2003). "The dispute at issue is decidedly

Swiss, and the Court is persuaded that Plaintiffs, if they so choose, would be able to adequately and more appropriately litigate this dispute in Switzerland." *In re Alcon*, 719 F.Supp.2d at 279.

### b. Dismissal Will Be Conditional

Although the Court has concluded that this case is best heard in Switzerland, there are open issues that compel the imposition of conditions on a grant of the *forum non conveniens* motion.

The first condition is that all Defendants consent to the jurisdiction of the competent Swiss court. While I believe that Defendants have made a showing that the Credit Suisse Individual Defendants are amenable to suit in Switzerland – and while I have little doubt that the Credit Suisse Entity Defendants are likely amenable to suit there, despite the fact that they are U.S. corporations – I am not 100% sure about the former conclusion, and the latter is pure supposition on my part, since the parties did not bother to brief that specific issue. And because of the perfunctory nature of the KPMG Defendants' joinder in the *forum non conveniens* motion, there is literally no discussion of their amenability to suit in Switzerland – just a discussion of whether a claim can be stated against them under Swiss law, which, as I noted, is not an issue I am interesting in resolving. Therefore, I am requiring all Defendants to get rid of this issue by consenting to jurisdiction in Switzerland on the claim asserted under the First Cause of Action in the Complaint filed in this court (and no other claim).  They have twenty days to file written consents with the Court; counsel may file representations on behalf of their clients.

I emphasize that consent to jurisdiction on this singular claim does not mean that Plaintiffs can start pleading new claims in Switzerland; any consent filed in this case in limited to the assertions of the First Cause of Action in the instant complaint and to no other claim. Moreover, no consent to jurisdiction shall be interpreted as a concession that the First Cause of

Action actually states a claim for relief under Swiss law. Whether Plaintiffs have stated a claim for relief, and against whom, are matters best decided by the experts in Swiss law – Swiss judges in a Swiss court of competent jurisdiction.

Second, the Swiss court has to accept jurisdiction. Given PILA Article 3, Sec. 3(b), which states that a Swiss court may not decline jurisdiction to hear a case arising under Swiss law, I believe this requirement to be purely pro forma. But I impose it nonetheless. This of course assumes that plaintiffs take steps to move their Swiss law claim to Switzerland.

Third, Defendants have to enter into a partial waiver of statute of limitations defenses. What the applicable statute of limitations is will be decided under principles of Swiss law. However, the statute stopped running here in the United States on May 30, 2023, when the operative Complaint was filed. I do not know whether, if the First Cause of Action were refiled in Switzerland, the statute of limitations would run from the date on which the claim was first asserted in the United States or on the date of filing in Switzerland. It is thus appropriate to condition *forum non conveniens* dismissal on a waiver of any defense of statute of limitations that accrued after the date this action was filed – May 30, 2023. Any statute of limitations defense that existed on the date this case was filed in New York, however, need not be waived, and indeed should be decided by the Swiss court.

## IV. Plaintiffs' Claims Against the Remaining Defendants Are Dismissed

Several of the Individual Defendants – Cerutti, Rohner, and Sohn – have not been served with process in this case and did not join in any of the motions to dismiss. Dkt. No. 86. Nevertheless, "dismissal of the claims against them is warranted because the Court's holdings

above necessarily establish the inadequacy of the [Complaint] as to them." *In re Hebron Tech. Co. Sec. Litig.*, No. 20 Civ. 4420, 2021 WL 4341500, at *24 n.31 (S.D.N.Y. Sept. 22, 2021).

Accordingly, the RICO claim is dismissed with respect to the unserved Defendants, and the First Cause of Action is dismissed on *forum non conveniens* grounds. *See Cartwright v. D'Alleva*, No. 17 Civ. 5953, 2018 WL 9343524, at *9 (S.D.N.Y. Aug. 27, 2018); *Johnson v. New York City*, No. 12 Civ. 4379, 2013 WL 950870, at *3 (S.D.N.Y. Mar. 7, 2013); *Virtual Dates, Inc. v. Afternic.com, Inc.*, No. 01 Civ. 4023, 2001 WL 1646451, at *2 (S.D.N.Y. Dec. 20, 2001).

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss the Complaint are GRANTED.

Count I against the Defendants is conditionally dismissed on *forum non conveniens* grounds. Counts II and III are dismissed with prejudice and without leave to amend.

The Clerk of Court is respectfully directed to terminate: the motions in *Stevenson* at Docket Numbers 68, 79, 82, 86, and 90; and the motions in *Lawtone-Bowles* at Docket Numbers 35, 46, 49, and 53.

This constitutes the decision and order of the Court. It is a written opinion.

Dated: February 14, 2024

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

92